UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIE WALKER,

                        Petitioner,

    -vs-

JAMES CONWAY,

                      Respondent.
_____

**REPORT AND RECOMMENDATION
No. 04-CV-6056(DGL)(VEB)**

## I.      Introduction

Willie Walker ("Walker" or "petitioner") filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on October 6, 1997, in New York State Supreme Court (Erie County) on charges of first degree assault and third degree criminal possession of a weapon. United States District Judge David G. Larimer has referred this matter to the undersigned pursuant to 28 U.S.C. § 636(b) for the issuance of a Report and Recommendation regarding the disposition of Walker's habeas petition.

## II.     Factual Background and Procedural History

### A.     Summary of Pre-Trial Proceedings

The conviction here at issue arose from Walker's involvement in an altercation with his former step-son Darin Grant ("Grant" or "the victim") on March 29, 1996, in which Walker stabbed Grant multiple times in his back, left hand, and face. Walker was arrested in connection with the incident on April 5, 1996, and charged in a four-count indictment with second degree attempted murder (New York Penal Law ("P.L.") §§ 110.00, 125.25(2)), first degree assault (P.L.

§ 120.10(1)), second degree assault (P.L. § 120.05(2)), and third degree criminal possession of a

weapon (P.L. § 265.02(1)). Walker was tried before a jury in Erie County Court (DiTullio, J.) in

June 1996.

### B.      Petitioner's Trial

#### 1.      The Prosecution's Case

Grant testified that his mother and petitioner had been married, but at the time of the

incident, they were divorced yet still living together. T.40, 77.[1] At about 2 a.m. on March 29,

1996, Grant went to "Mom's Christian Diner," the restaurant where petitioner worked, located on

Delevan Street in the City of Buffalo. He was accompanied by his friends, Anthony Clark and

Saleem Akbar. T.45. Grant's purpose in going to the restaurant was to retrieve his mother's car

keys and house keys. T.45. Grant testified that he went to use the car to drive to work earlier that

day, the car was gone; he eventually learned from his mother that Walker had the car. T.42-43.

Grant also testified that he was under the impression that the car had been reported stolen when,

in fact, it had not been. T.44-45.

When Grant arrived at the diner, he knocked on the window and Walker motioned for

him to come to the rear door. T.46. Grant entered the restaurant through the back screen door,

which was closed but not locked. T.47. As soon as he walked in, "Andrea [Jones, the restaurant

manager] jumped up and started screaming at [him]." T.47. Walker, in a raised voice, told Grant

that he was not going to give Grant's mother's keys back to him. T.47-48.  Jones "put her hand in

[Grant's] face," and Grant moved it away.  T.47-48. That is when Walker "came over and

stabbed [him]" in the left part of his mouth with a butcher knife with a six to eight-inch blade.

---

[1]        Citations to "T.__" refer to the trial transcript.

T.48, 50, 53. Grant then hit Walker with a closed fist on the side of his face. T.48. Grant testified

that after he punched Walker, Grant "[s]tarted backing up" toward the back of the restaurant

where he had come in. At that point, Walker starts to "[r]un[] toward" Grant with the knife,

moving his right hand forward, "trying to stab [Grant] again." T.51. Grant testified that Walker

then stabbed Grant's left hand; Grant had put his hands up to block his face since Walker was

coming towards his face with the knife. T.50, 51, 52, 53; T.48-49.

Grant testified that he was "shocked" at how deep the cut in his hand was; that is when he

turned around and started  moving toward the rear door. T.52. As Grant was running away, with

his back to Williams, T.53, Williams stabbed Grant two times in the back. T.53. Grant told his

friends, "[G]et back, he has a knife." T.54. Grant related that once he was outside, he "fell into

somebody's arms" and was placed in his friend Saleem Akbar's car. They immediately went to

the emergency room at ECMC hospital, arriving at 2:15 a.m. T.54, 58. Grant testified that he did

not have a weapon at any time during the assault. T.53.

Grant's friend, Anthony Clark ("Clark") testified that he was waiting for Grant at the

front of Mom's Christian Diner when he heard a "commotion" toward the back. T.102. He ran to

the rear of restaurant to the kitchen where he saw Grant and petitioner "trading punches." T.103.

When Grant turned around, Clark could see that his face was "cut up." T.103. Grant was trying to

push Clark and Saleem Akbar ("Akbar") out the rear door.  T.103. Clark related that he saw

Walker stab Grant with a butcher knife with an eight-inch blade. T.104. After he saw Walker stab

Grant twice in the back, he pushed Grant out the door. Clark testified that Walker was still

wielding the butcher knife. Clark grabbed two bricks, and threw them at Walker. At that time,

Walker was holding a chair in one hand and the butcher knife in the other. T.106.

-3-

Grant's friend Akbar testified that he was watching Walker, Grant, and Jones argue through the front door of the restaurant. At one point, Akbar saw Grant push Jones out of the way. Walker then "came slashing towards [Grant], lunging at him with the knife." T.125-26. Akbar testified that he saw Walker "slash[ ]" Grant across his mouth with the knife. T.126. Akbar related that Grant kept trying to move back, but Walker continued to come after him with the knife. T.126. Akbar testified that Grant did not have a weapon at any time during the incident. T.127. Akbar testified that when Grant's back was towards Walker and he was moving backwards towards the door, Walker "lunged at [Grant] with the knife." T.128-29. Akbar testified that he saw Walker "stab [Grant] in the back with the knife at that point. T.129. As Grant made it out of the restaurant, Akbar threw a chair at Walker, who was still wielding the knife, hitting Walker in the back. T.130. Akbar then left restaurant and, along with Clark, immediately drove Grant to the hospital to get medical attention for his injuries.  T.131.

Dr. Scott Boulinger ("Dr. Boulinger"), the surgical resident who treated Grant at the emergency room following the stabbing, testified that when Grant arrived at 2:11 a.m., he noted two incisions in his back which were bleeding. T.210. An x-ray revealed the possibility of a dropped or collapsed lung, or a pneumothorax; as a result, they inserted a chest tube to relieve the accumulation of air in the chest cavity. T.211. Grant had a two-centimeter laceration to the left side of his lip which was "fairly deep[,]" T.213 and a four-centimeter laceration on the back of his left hand between the thumb and first finger. T.215. Sutures were used to close the two wounds, both of which left permanent scars visible on the victim at trial. T.214-17. Dr. Boulinger observed "actual incisions" on the victim's back; the first one was at the scapular area about three centimeters and was "fairly deep" with "subcutaneous tissue protruding from the wound[.]"

T.217-19. There was another incision about "an inch or two" to the left of the spine. Over

defense objection, Dr. Boulinger testified that an actual stab wound to the spine potentially could

have led to paralysis or at least lower extremity dysfunction. T.219. The wounds to the back were

closed with staples, and Dr. Boulinger expected the victim to have permanent scarring. T.219-20.

Dr. Boulinger characterized the lacerations or incisions sustained by the victim as "stab

wounds." T.220. On cross-examination, he that the wounds could have been made by a knife but

he admitted, "I don't know if it was made with the knife [introduced into evidence as the

weapon], if that's what you mean." T.227.

Richard Spencer ("Spencer"), the forensic chemist for Erie County, testified that he

examined the clothing (a jacket with leather sleeves, a pair of blue denim jeans, a green pull-over

cotton shirt, and a white T-shirt) worn by Grant during the incident. T.196-97. Spencer found

two longitudinal slits with blood stains in the back of the green shirt; on the white T-shirt. he

found two slits in the same pattern with the blood also in the same pattern. T.197-98. The blue

jeans were "cut extensively through . . . in the fashion . . . employed by emergency medical

people." T.198. The jacket had "stab holes in the back that corresponded approximately to the

stab holes in the green pull-over shirt and the white undershirt" and "had blood present . . . in the

same general type of pattern as was seen on the other clothing." T.199. Spencer testified that, to a

reasonable degree of scientific certainty, that the cuts on all of the garments examined were "stab

holes" and not "slash holes[.]" T.205-206. Slashing, *i.e.*, moving the arm through an arc, as

opposed to stabbing, "produces a separation of the fabric, which is consistently longer than the

width of the fabric" as well as "indefinite edges" and an "uneven depth of penetration." T.205-

06.

On cross-examination, Spencer testified that the width and the depth of stab wounds depends "[p]artially on the sharpness of the instrument, but more importantly on the power behind the thrust." T.206. Spencer admitted that, "[r]elatively speaking," a "weak person with a sharp instrument could make the same cut[.]" T.206. Spencer testified that it "look[ed] like" the entrance holes on the victim's clothing were "made with a knife plunging forward into the body" but he admitted that he did not know with how much force. T.207.

Officer Greg O'Shei ("Officer O'Shei") of the Buffalo Police Department testified that he and his partner interviewed Walker at the hospital to find out how his injuries had been caused, initially asking him how well he knew Grant and what had happened. T.160. Walker made statements regarding his actions and those of Grant and several other unidentified individuals. In particular, Walker said, "I suspected I stabbed [Grant] because I swung and he fell back." T.162. At that point, Officer O'Shei testified, he read the *Miranda* warnings from a pre-printed card to Walker, who stated that he understood them and wanted to speak to the police. He also put his initials on the back of the card with the warnings. Walker appeared coherent, was not dazed, and "absolutely" appeared to understand their questions. T.161. Walker then gave an oral statement, the substance of which Officer O'Shei related to the jury.[2] Officer O'Shei testified that Walker said, "I  suspected I stabbed [Grant] because I swung and he fell back," *before* the police told him

_____

[2]      Officer O'Shei summarized Walker's statements to him as follows: "He [Walker] made various statements during our conversations in regards to the actions that occurred. He said, 'I don't know, the back door may have been open.' He went on to say, 'I think they broke in through the back door.' He also said that, 'I told my manager [Jones] that I had to lock the door because I suspected them to be coming after me.' He also said that he took the car and parked it and told Darin Grant's mom that it was stolen. He also told Police Officer Maurice Grant that the car had not been reported stolen. He went on to tell us that Darin Grant had called him and asked him if the car was reported stolen, and that Mr. Walker had answered, 'No, it was not reported stolen.' Darin Grant threatened to come to Willie Walker's place of employment. Mr. Walker indicated[,] . . .'Darin Grant entered through the rear door and punched me. I picked up a knife and swung back. I suspect I stabbed him because he fell back.' [Walker] also said there were five or six individuals with Darin Grant." T.166-67.

about Grant's medical condition. T.168.

Officer Sheldon Howard ("Officer Howard"), who responded to the scene of the incident at about 2:15 a.m. following the 911 call, testified that he encountered Walker and Jones. T.144. Officer Howard observed that Walker had "a little cut on the back of his head." T.148. Officer Howard testified that Walker told him that Grant and several other individuals "forced their way into the restaurant" and that Grant "threw a rock at him" and "hit him in his head[.]" T.146-47. At that point, Grant and the others "took off from the restaurant." T.146.  Walker did not tell Officer Howard that he had stabbed Grant or that he (Walker) had a knife during the incident. T.147. Officer Howard testified that Jones, who "chimed in answers" as he was talking to Walker, T.150, did not mention that Walker had stabbed Grant. T.147. Officer Howard testified that when he left the restaurant, he did not know anyone had been stabbed during the incident about which the 911 call had been placed. T.148.

On cross-examination, Officer Howard agreed that the kitchen was in a "messed-up condition" and that kitchen items had been "tossed around[.]" T.148-49. Officer Howard described the screen-door on the back-door to the restaurant as "partially damaged[.]" T.149. Defense counsel elicited from Officer Howard that based on the information he received from Walker, he generated a "general offense report" charging Grant with burglary and criminal mischief. T.151-54. On re-direct examination, Officer Howard testified that his "general offense report" did not include anything about the stabbing was because he did not learn about that during his conversation with Walker. T.156.

Officer Mark Lauber ("Officer Lauber") visited Mom's Christian Diner on March 30, 1996, for the purpose of investigating both the complaint of the burglary by the restaurant owner

and the stabbing of Grant by Walker. In his opinion, there was no permanent damage to the back-door or any other part of the restaurant; he could not tell that there had been some type of altercation on the previous day. T.175. When Officer Lauber asked to speak with Jones, Walker, and Reverend Leon Williams, the restaurant owner, the other restaurant employees told him that those individuals were "too busy to talk to [him]." T.175.  Officer Lauber returned to the restaurant on March 31, 1996, and again in mid-May 1996, but he was never able to speak with Walker, Jones or Williams. T.176-77. Officer Lauber testified that on April 1, 1996, he received a name and phone number of a person identified as Walker's son, Karl; he called this person at his place of employment and left a message twice but never heard back from him. T.177, 188.

On cross-examination, Office Lauber admitted that Grant was the nephew of Officer Maurice Grant, who was a member of the 13th Precinct at the Buffalo Police Department. T.186. Officer Lauber testified that Maurice Grant had never been assigned to his precinct, the 11th Precinct. T.186.

On re-direct examination, Officer Lauber testified that Leon Williams, the owner of the restaurant, was the uncle of Officer Karl Flemming, who was assigned to the 11th Precinct of the Buffalo Police Department. T.190. Officer Lauber testified that the fact Grant was related to Maurice Grant did not change how the investigation was handled by the Buffalo Police Department. T.190.

Defense counsel moved for a trial order of dismissal as to all four counts in the indictment at the close of the prosecution's case. *See* T.231-33. The prosecutor opposed dismissal of any of the counts. *See* T.233-35. The trial court denied the application "based on the arguments of counsel and the evidence presented to date" and ruled that the evidence was

sufficient to send all four counts to the jury. T.235.

     **C.**     **The Defense Case**

     Jones testified she was the restaurant manager at Mom's Christian Diner. She related that Grant arrived at about 2:00 a.m. with "about six or seven of his friends" and "banged on the door[.]" T.270. Jones described Grant as a "big guy[,]" about 6'2" and 225 pounds. T.266. Jones testified that when Grant arrived, Walker told her, "[D]on't let them in, there might be some problems." T.270. Jones related that she kept the front door to the restaurant locked after 11 p.m., even when the restaurant was open; the front door was locked when Grant arrived but the back door to the kitchen was not locked. T.268, 270. According to Jones, Grant "kept screaming, he kept yelling about some keys, some house keys, he just wanted keys." T.270. Jones testified that told Grant to leave. T.271. About five minutes later, Jones testified, Grant broke into the restaurant through the rear door with Akbar and Clark. T.271. Jones testified that she asked them "nicely" again to leave, but Grant continued "yelling about keys[.]" T.272. Jones testified that he would not leave; she "touched him, [and] he knocked [her] hand away and pushed [her] out of the way." T.275. At that point, according to Jones, Grant and Walker were face-to-face and were fighting. T.275-76.

     Jones related that after the fight started, glasses, cups and silverware "started getting thrown." T.276. Jones testified that she observed "four or five individuals throwing items at [her]self and at Willie [Walker]." T.276. Jones tried to leave through the front door but it was locked. T.276. She walked toward the back of the restaurant where she encountered Clark, and said to him, "Anthony . . . , please get them out of here, stop it, break it up[.]" T.277. At that point, Jones saw "the two . . . guys in the kitchen" and knew she could not get out through the

back door. T.277. She therefore exited the restaurant through a third door (not the front or back

door) and walked across the street to a phone booth on the corner.  T.277. Jones stated that she

watched the scuffle from outside the restaurant on the street and saw "three guys . . . fighting"

with Walker, and had "kind of got him . . . backed up into the corner." T.278. Jones testified that

she saw "plates . . . thrown, . . . bricks getting thrown at him." T.278. Jones said that two chairs

were thrown also. T.278.

She did attempt to make a 911 call from the payphone from which she was watching the

altercation; she stated that she was "not sure if it went through or not" as the phone was not

working right, so she ran next door to the mini-mart. She did not call 911 then, however. T.279.

When asked how many times she called 911, she stated she "believe[d]" it was three. When

asked why, she said she "was scared the man [Walker] was going to be killed." T.279.

On cross-examination, Jones claimed that she never got a message that Officer Lauber

wanted to speak to her personally although she admitted that she knew Reverend Williams had

received such a message. T.280-82. She claimed that she "never received" a grand jury subpoena

from Officer Lauber, but she testified that she received the subpoena to testify in Walker's

behalf, whom she said she "liked" and whom she described as a "nice guy." T.282. Jones

testified that she did not receive any injuries during the fracas and was able to leave restaurant

through the front door without incident. T.287.

Peter Passino testified that he was the ambulance driver who picked up Walker on the

night of the incident and brought him to the emergency room at Sisters Hospital. T.259-62.

Passino testified that he understood that Walker had been assaulted but he could not

independently recollect Walker or his injuries. *See* T.260. Defense counsel introduced the

ambulance report indicating that the emergency medical personnel had assessed Walker as having a laceration to his thumb and to the back of his head. T.206.

Walker testified in his own behalf at trial. He stated that when Grant and some of his friends showed up at Mom's Christian Diner, he refused to let them in because he was afraid there "might be some problems." T.297. Walker testified that within a few minutes, he heard the back-door "bust up against the sink" and when he turned around, Grant and "some of his friends" were standing there. T.298-99. Once they were inside, Jones "tried to get them out," and "there came a time when Darin [Grant] pushed her to the side." After that, he "proceeded to pound on [Walker], started hitting [him]." T.299-300. Walker testified that the first punch "caught [him] by surprise" and he was "kind of dazed." T.300. Then he "was hit again" and he "felt a hard object hit [him], which was a brick." T.300. Walker testified that he "remember[ed] falling back" into a utility rack.[3] T.300. When asked if there came time when he had a knife in his hand, Walker responded "yes" and said that he "swung [the knife]" at "[w]hoever was coming after [him]." T.300, 317. At the time he started "swinging the knife," Walker testified, he was "thinking about staying alive." T.309.

The prosecutor confronted Walker with his grand jury testimony that the first time he swung the knife, he hit Grant in the mouth, and the second time, he hit Grant in the hand with the knife. T.320. Walker said, "I don't remember that[,]" but "I am not saying I didn't, no." T.320. The prosecutor questioned Williams about his grand jury testimony in which he was asked if he made certain oral statements to the police admitting his belief that he had stabbed Grant:

---

[3]    Walker and the other defense witnesses testified regarding the layout of the restaurant based on photographs taken by defense investigator Roger Putnam on December 3, 1996. *See* T. 243-54.

> Q:    Do you remember being asked this question and giving this answer to the Grand Jury on May 16th 1996 . . . "Question: Do you remember telling a member of the Buffalo Police Department when they interviewed you on the morning of March 29th, 1996 at Sisters Hospital, I suspect I stabbed him because he fell back? Answer: I remember saying something to that effect, yes."
>
> A:    Okay. That was your statement and if I remember correctly I said I don't remember saying those exact words.
>
> Q:    One line below [that], do you remember being asked this question and giving this answer? "Question: So that night only hours after this incident you told the police that you believe that you had stabbed Darin Grant, correct?" "Answer: Yes."
>
> A:    I never stated that I believed I stabbed him. I said I may have hit him, I don't know.
>
> Q:    Question before the Grand Jury – "Question: Now you're telling us that you believe you stabbed him?" "Answer: I believe, I did, yes."
>
> A:    Let me see that. I don't remember the word stab, but if you say that is there, that is there. I don't ever remember saying I stabbed him.

T.308-09. Walker admitted, "I don't remember telling [the grand jury] I was thinking about staying alive" during the incident. T.311. Walker testified that he "was saying it . . . maybe not in the same words[.]" He testified that where he said, "'I fought them off as well as I could,' would be the same thing as . . . I was trying to stay alive." T.312-13. As to how he came to have the butcher's knife in his hand, Walker testified in the grand jury as follows:

> Q:    Do you remember being asked these [sic] series of questions and giving these answers? . . . "Question: You were bracing yourself from the fall, correct?" "Answer: Yes, I was." "Question: As you had to brace yourself your hands happened to hit the utility rack." "Answer: Yes." "Question: There came a point in time when you pulled your arm away from the utility rack?" "Answer: Yes." "Question: At that point in time there happened to be a butcher knife in your hand?"

T.318-19. Walker explained, "At that point in time I was pulling away, trying to pick myself back up, something was in my hand, I got up and started swinging." T.319. He confirmed that the butcher knife's handle was black and that it was in his right hand and although he gave the grand

jury an estimate, he did not know "exactly what it was." T.319. He admitted that he did not see a

weapon in Grant's hands during the incident. T.320. Walker testified that when he took the knife

from the utility rack, the closest person to him was Grant. T.322-23. Walker testified that he

"was not saying [he] didn't stab [Grant] in the back." T.323.

Walker testified that he had "borrowed" Sharon Grant's car earlier on the day of the

incident. T.313. He admitted that at some point he claimed that the car was stolen. However, he

testified, he never called the police to report it was stolen. T.313-14.

With respect to the injuries he received, Walker initially claimed at trial that he had

stayed at the hospital overnight. T.314. In his grand jury testimony, however, Walker testified

that he was released later that morning and was not admitted. T.315. Walker received about six

or seven stitches for the laceration to his head but he not require or receive any medical treatment

for the two punches in the face he claimed to have received from Grant. T.316-17. After he left

the hospital, he did not seek further medical treatment. T.315.

Reverend Leon Williams ("Williams"), the owner of Mom's Christian Diner, testified

that when he came to the restaurant at about 2:30 a.m. on the morning of the incident, the screen-

door to the back-door was "half-way hanging on its hinges." He related that "tables were

overturned, dishes all was broken [sic], the food was spread all over the restaurant, stoop was

broken down, sink [sic] was completely off its – bricks hanging from the wall." T.291.

According to Williams, "it was just like totally a mess." T.291. He testified that he stayed there

"all morning" cleaning up the mess. T.291.

On cross-examination, Williams admitted to a conviction on January 4, 1978, of

promoting prostitution in the third degree for taking money, between June 1 and July 7, 1976,

from a woman who was earning it as a prostitute, and for threatening her with physical injuries.

T.293. Williams denied that on July 7, 1976, he caused physical injury to the woman by beating

her, however. T.293. Williams testified that he had been a reverend since 1983. T.292-93.

Williams stated that Walker was a friend of his. T.295.

After the proofs were closed, defense counsel requested that the trial court charge the jury

with the defense of justification relating to the use of deadly physical force as well as the defense

of justification involving the ordinary use of physical force in defense of premises. T.330-31. The

prosecutor opposed the defense request for a charge on the defense involving the use of ordinary

physical force in defense of property, since the "only proof ," including petitioner's testimony,

was he "used deadly physical force, that is[,] the use of the knife." T.331. With respect to the

defense of justification involving deadly physical force, the prosecutor argued that Walker failed

to "establish[ ] through any of his testimony that he was in intimate [sic] fear of receiving"

deadly physical force from Grant since Walker testified that Grant never had a weapon in his

hand. T.332. The trial court granted defense counsel's requests to charge justification involving

the use of deadly physical force[4] in defense of self with regard to the first and second counts of

---

[4]

"1. A person may, subject to the provisions of subdivision two [of N.Y. Penal Law § 35.15], use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:
(a) [t]he latter's conduct was provoked by the actor with intent to cause physical injury to another person; or
(b) [t]he actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force[.]
. . .
2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:
(a) [t]he actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows

the indictment charging attempted second degree murder and first degree assault. She ruled that

the jury would be charged on the use of ordinary physical force in defense of premises with

regard to count three (second degree assault) but not with regard to count four (criminal

possession of a weapon). T.335-36. The jury also was charged with second degree assault as a

lesser included offense of attempted second degree murder.

### D.      The Verdict and Sentence

The stand-alone count of the indictment charging second degree assault was not

submitted for the jury's consideration. The jury returned a verdict convicting Walker of first

degree assault and third degree criminal possession of a weapon as charged in the indictment, but

acquitting him of second degree attempted murder. The jury convicted him of second degree

assault, a lesser included offense of the attempted murder charge.

Prior to sentencing, the prosecution moved to have Walker sentenced as a persistent

felony offender. Following a hearing, Walker was adjudicated as a persistent felony offender and

sentenced to concurrent indeterminate terms of imprisonment, the longest of which was twenty

years to life on the first degree assault conviction.

### E.      Post-Conviction Proceedings

---

that with complete personal safety, to oneself and others he or she may avoid the necessity of so
doing by retreating; except that the actor is under no duty to retreat if he or she is:
(i) in his or her dwelling and not the initial aggressor; or
(ii) a police officer or peace officer or a person assisting a police officer or a peace officer at the
latter's direction, acting pursuant to section 35.30; or
(b) [h]e or she reasonably believes that such other person is committing or attempting to commit a
kidnapping, forcible rape, forcible criminal sexual act or robbery; or
(c) [h]e or she reasonably believes that such other person is committing or attempting to commit a
burglary, and the circumstances are such that the use of deadly physical force is authorized by
subdivision three of section 35.20."

N.Y. Penal Law § 35.15.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the convictions of first degree assault and third degree criminal possession of a weapon. *People v. Walker*, 275 A.D.2d 1009 (App. Div. 4th Dept. 2000). However, the Appellate Division found that Walker could not have committed first degree assault without also committing second degree assault. *Id.* (citing, *inter alia*, N.Y. Crim. Proc. Law § 300.30(4) ("Concurrent counts are 'inclusory' when the offense charged in one is greater than any of those charged in the others and when the latter are all lesser offenses included within the greater. All other kinds of concurrent counts are 'non-inclusory.'"); *People v. Grier*, 37 N.Y.2d 847, 848 (N.Y. 1975) ("Defendant, on the facts of this case, could not have committed the robbery without also committing the grand larceny, the counts being inclusory and concurrent. Where the verdict is comprised of inclusory concurrent counts a verdict of guilty on the greatest count is deemed a dismissal of every lesser count.") (citing (N.Y. Crim. Proc. Law § 300.40(3)). Therefore, the Appellate Division modified Walker's judgment by reversing the conviction of second degree assault, vacating the sentence imposed for that conviction, and dismissing count three of the indictment, but it did not modify his sentence. *People v. Walker*, 275 A.D.2d at 1009. Leave to appeal to the New York Court of Appeals was denied. *People v. Walker*, 96 N.Y.2d 739 (N.Y. 2001).

Walker moved, *pro se*, to vacate the judgment of conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 alleging numerous grounds for relief, all of which were denied. *See* County Court Order dated October 29, 2002, attached to Petition (Dkt. #1). Leave to appeal to the Appellate Division was denied. *See* Petitioner's Leave Application and Certificate Denying Leave to Appeal, attached Exhibit ("Ex.") D in Respondent's Appendix of

Exhibits ("Resp't Ex."), submitted in connection with respondent's Answer ("Ans.") (Dkt. #5) and Opposition Memorandum of Law ("Resp't Mem.") (Dkt. #6) to the habeas petition.

Walker filed his petition for federal habeas relief in district court on January 27, 2004. *See* Pet. (Dkt. #1). Attached to the form petition are a sheaf of handwritten pages which the Court will refer to as the "Supplement to Petition" ("Supp. Pet.") and in which Walker has provided further argument regarding the foregoing issues and asserted additional grounds for habeas relief. *See* Supp. Pet. at 1-7 (Dkt. #1). As his first ground for relief in the Petition, Walker claims that the victim's family improperly influenced the police to discontinue the investigation into the burglary complaint filed by the restaurant owner against the victim, and that police committed misconduct by, among other things, fabricating evidence in the investigation against him and giving perjured testimony at the grand jury and at trial. *See* Pet. ¶A (Dkt. #1). Walker's second ground for relief in his petition is termed "prosecutorial misconduct"; the bases for this claim appear to be that the prosecutor (a) conspired to conceal the alleged police misconduct; (b) used "fabricated evidence and perjured testimony" when "seeking to indict" petitioner; (c) introduced "false evidence" in form of "misleading photographs" at trial; (d) failed to call two "material witnesses"; and (e) failed to comply with the disclosure obligations of *Brady v. Maryland*. *See* Pet., ¶22(B) at 8 (Dkt. # 1); *see also* Supp. Pet. at 2-4 (Dkt. #1). The petitioner's third ground for relief is that his "conviction [was] obtained by use of a coerced confession"; he alleges that his oral statements to the police were made in the absence of *Miranda* warnings. Pet., ¶22(C) at 8 (Dkt #1). As the fourth ground for relief in the petition, Walker asserts a claim which he terms "missing witness" but which is based on the same factual allegations as his claim under his second ground for relief that the prosecutor failed to call "material witnesses". *See* Pet., ¶22D

-17-

(Dkt. #1); Supp. Pet. at 3-4 (Dkt. #1). Walker also asserts a claim termed "judicial misconduct" but which is actually a claim that the trial court's jury instructions on the defense of justification and on interested witnesses were erroneous. *See* Supp. Pet. at 5-6 (Dkt. #1). Finally, Walker claims that his trial counsel was ineffective on numerous grounds. *See* Supp. Pet. at 6-7 (Dkt. #1).

Respondent has asserted the defenses of non-exhaustion and procedural default as to a number of Walker's claims, as discussed more fully below. For the reasons that follow, the Court recommends that Walker's request for a writ of habeas corpus be denied and that the petition be dismissed.

## III.    Legal Principles Applicable to Habeas Petitions

### A.    Standard of Review

The filing of Walker's petition post-dates the April 24, 1996 enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") and therefore is governed by that statute's amendments to 28 U.S.C. § 2254.  When a state court has adjudicated a habeas petitioner's claims on the merits, habeas relief may not be granted unless the state court's holding was contrary to, or was an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or was based on unreasonable determination of the facts in light of the evidence presented in petitioner's state court proceeding. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  AEDPA has "significantly curtailed the power  of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. at 399). "Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only

erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (*per curiam*); *see also Williams v. Taylor*, 529 U.S. at 409  (2000). In order to grant the writ under AEDPA there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

### B.    The Exhaustion Requirement

"A federal court may not grant a writ of habeas corpus to a state prisoner 'unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (quoting 28 U.S.C. § 2254(b)), *cert. denied*, 514 U.S. 1054 (1995). In order to meet Section 2254(b)'s exhaustion requirement, a petitioner must have presented the substance of his federal claims "to the highest court of the pertinent state." *Id.* (quotation omitted; citing *Picard v. Conner*, 404 U.S. 270, 275 (1971) ("It follows, of course, that once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied.")). Where the petitioner no longer has "remedies available" in the state courts under 28 U.S.C. § 2254(b), because, for instance, a state procedural bar rule precludes the petitioner from litigating the claims, the federal habeas court will "deem the claims exhausted." *Id.* (citing *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991) (citing *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989), *Castille v. Peoples*, 489 U.S. 346, 351 (1989) and *Engle v. Isaac*, 456 U.S. 107, 125-26 n. 28 (1982)). However, the "procedural bar that gives rise to exhaustion provides an independent

and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim," *Gray v. Netherland*, 518 U.S. 152, 162 (1996). A habeas petitioner's forfeiture in state court of his federal claims bars him from litigating the merits of those claims in federal habeas proceedings, absent a showing of "cause" for the procedural default and "prejudice" resulting therefrom, or that the failure to consider the claims would result in a "fundamental miscarriage of justice." *Grey*, 933 F.2d at 121 (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-91 (1977)).

### C.      The "Adequate and Independent State Ground" Doctrine

The Supreme Court has held that federal courts shall "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). "This rule applies whether the state law ground is substantive or procedural." *Id.* (citations omitted). The independent and adequate state ground doctrine may bar federal habeas review "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement" for in such cases "the state judgment rests on independent and adequate state procedural grounds." *Id.* (citing, *inter alia*, *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977)).  The issue of when and how a petitioner's failure to comply with a state procedural rule can preclude consideration of a federal question is itself a federal question. *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quotation marks omitted) and citing *Lee*, 534 U.S. at 375 ("'[T]he adequacy of state procedural bars to the assertion of federal questions,'" we have recognized, is not within the State's prerogative finally

to decide; rather, adequacy "'is itself a federal question.'") (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).  "[A] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Whether application of the procedural rule is "'firmly established and regularly followed'" must be judged in the context of "the specific circumstances presented in the case," and "of the asserted state interest in applying the procedural rule in such circumstances." *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362, 386-87 (2002))[5].

An adequate and independent finding by a state court of procedural default precludes federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray v. Carrier*, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim on habeas will result in a "fundamental miscarriage of justice," *id.* at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)); *accord Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To be sufficient to excuse a procedural default,

---

[5] In *Lee*, the Supreme Court made clear that although "[o]rdinarily, violation [sic] of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim," there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." 534 U.S. at 376. In determining that petitioner Lee's case fit "within that limited category," *id.*, the Court relied on three considerations: (1) whether the alleged procedural violation was actually relied upon in the trial court, *id.* at 381, and whether "flawless compliance, *id.* at 382, with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented, *id.*; and (3) whether petitioner had "substantially complied," *id.* with the rule given "the realities of trial," *id.*, and, therefore, whether demanding perfect compliance with the rule was necessary to further a legitimate governmental interest, *id.* at 385; *accord Cotto*, 331 F.3d at 240. Although the *Lee* court did not present these three factors as a "test" for determining adequacy of a state ground, the Second Circuit adopted them as "guideposts" in "'evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case.'" *Id.* (quoting *Lee*, 534 U.S. at 386). The most important aspect of *Lee*, according to the Second Circuit, was its clarification, over a strong three-justice dissent, that the "adequacy" of a state procedural bar is determined with reference to the "'particular application'" of the rule; a rule is not "adequate" simply because it "'generally serves a legitimate state interest.'" *Id.* (quoting *Lee*, 534 U.S. at 387).

"cause" must be something external to the petitioner, something that cannot fairly be attributed to him. *Id.* In other words, demonstrating cause "must ordinarily turn on whether the prisoner can show that some "objective factor external to the defense" impeded counsel's efforts to comply with the state's procedural rule. *Murray*, 477 U.S. at 488 (giving, as examples of "external factors," a demonstration that the "the factual or legal basis for a claim was not reasonably available to counsel" or that "some interference by officials . . . made compliance impracticable").

The "prejudice" prong requires that the petitioner show "actual prejudice," *McCleskey v. Zant*, 499 U.S. 467, 493 (1991), "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual  and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," *id.* (quoting *United States v. Frady*, 456 U.S. 152, 170  (1982) (discussing cause and prejudice  test required for collateral relief pursuant to 28 U.S.C. § 2255 where error not raised at trial or on direct appeal)); *accord, e.g., Murray v. Carrier*, 477 U.S. at 493; *Bousley v. United States*, 523 U.S. 614, 630 (1998); *Massaro v. United States*, 538 U.S. 500, 503 (2003). The Supreme Court has held that a petitioner seeking to overcome the hurdle of a procedural default must demonstrate *both* cause for the default *and* prejudice attributable thereto. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982) ("Since we conclude that these respondents lacked cause for their default, we do not consider whether they also suffered actual prejudice. Respondents urge that their prejudice was so great that it should permit relief even in the absence of cause. *Sykes*, however, stated these criteria in the conjunctive and the facts of these cases do not persuade us to depart from that approach."); *accord, e.g., Murray v. Carrier*, 477 U.S. at 496. Failure to make a showing on either cause or prejudice

-22-

means that a petitioner will not be able to overcome the procedural default. *See id.*

The one exception to the cause-and-prejudice rule is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that the "failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards*, 529 U.S. at 451 (citing *Coleman v. Thompson*, 501 U.S. at 750). The "fundamental miscarriage of justice" exception is only available in "extraordinary" cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" *Murray v. Carrier*, 477 U.S. at 496; *accord Smith v. Murray*, 477 U.S. 527, 537 (1986).

## IV.    Analysis of Claims Raised in the Petition and Amended Petition

### A.    Police Misconduct

Walker asserts numerous improprieties on the part of the police in connection with their investigation of the incident. In particular, Walker alleges that the police officers "filed misrepresenting and fraudulent reports" regarding the incident and initiated the criminal investigation as a "special favor[] to the alleged victim." Pet. 22A (Dkt. #1). Walker raised the police misconduct for the first time his *pro se* supplemental appellate brief on direct appeal, and the Appellate Division rejected it as unpreserved because he failed to register a timely objection to the alleged police misconduct pursuant to New York's "contemporaneous objection rule," codified at C.P.L. § 470.05(2). *See People v. Walker*, 275 A.D.2d at 1009. When Walker raised this claim in a subsequent motion to vacate the judgment pursuant to C.P.L. § 440.10, the trial court dismissed the claim pursuant to the mandatory procedural bar rule codified at C.P.L. § 440.10(2)(c), which provides that a court *must* dismiss a motion for *vacatur* where the factual basis for the claim is record-based and could have been, but unjustifiably was not, raised on

direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c).

Respondent argues that the police misconduct claim is procedurally defaulted because each of the state courts to consider the claim rejected it on the basis of an "adequate and independent" state procedural rule. The Appellate Division did not examine the merits of the police misconduct claim at all, relying solely on the lack of preservation to dismiss the claim. Its holding based on C.P.L. § 470.05(2) clearly was an "independent" basis for decision. The issue is whether the C.P.L. § 470.05(2) was an "adequate" basis for the Appellate Division's dismissal of petitioner's police misconduct claim.

In its research, the Court was able to find only a scant handful of appellate division cases in New York dealing with unpreserved claims of alleged police misconduct. *See People v. Moore*, 160 A.D.2d 594, 595 (App. Div. 1st Dept. 1990) ("Defendant's constitutional argument that he was denied due process because of police misconduct associated with their purported entrapment efforts is likewise unpreserved for review[.]") (citing *People v. Michael*, 48 N.Y.2d 1, 6 (N.Y. ) (discussing C.P.L. § 470.05(2)); *People v. Zer*, __ A.D.2d __, 714 N.Y.S.2d 257, 258 (App. Div. 1st Dept. 2000) ("Defendant's contention that the indictment should be dismissed on the ground of egregious police misconduct is unpreserved due to the untimeliness of defendant's dismissal motion[.]"). The gist of these cases appears to be that a defendant generally must raise the issue of police misconduct when he becomes aware of it; the appropriate vehicle for bringing the issue to the trial court's attention appears to depend on the timing of the defendant's discovery of the allegedly wrongly acts or omissions. Because there appear to be so few cases on the preservation of police misconduct claims, and those that the Court found had such different factual patterns, the Court is unable to discern that objecting at trial pursuant to C.P.L. §

470.05(2) is a "firmly established and regularly followed" rule for the preservation of police misconduct claims. Here, Walker's claim alleges improprieties occurring throughout the criminal proceeding against him–from the initial investigation of the complaint, to the grand jury proceeding, to trial. The Court accordingly does not recommend finding that, under the circumstances presented here, the Appellate Division's reliance on C.P.L. 470.05(2) to dismiss Walker's police misconduct claim was an "adequate and independent" state ground for its decision.

Respondent argues another basis for finding a procedural default of this claim, namely, the trial court's dismissal of the claim pursuant to C.P.L. 440.10(2)(c) when Walker raised essentially the same claim in support of his C.P.L. 440.10 motion for *vacatur*. Finding that the "record contain[ed] sufficient facts to have permitted review of these claims by the Appellate Division" on direct appeal, the trial court denied the police misconduct claim pursuant to the mandatory dismissal provision articulated in C.P.L. § 440.10(2)(c). *See* County Court Order Dated October 29, 2002, at 4 (citing N.Y. Crim. Proc. Law § 440.10(2)(c)), attached to Pet. (Dkt. # 1). According to the trial court, Walker's claims of police misconduct were "merely conclusions drawn by the defendant from his analysis of the grand jury and trial testimony of various witnesses and certain items that were placed in evidence." Erie County Court Order Dated October 29, 2002, Denying C.P.L. § 440.10 Motion at 4, attached to Petition (Docket No. 1). The Court has reviewed the documents that Walker indicates he presented to the C.P.L. § 440.10 court. *See* Dkt. #10. It appears that Walker submitted, in connection with the C.P.L. 440.10 motion, materials in addition to those contained in the trial record. For instance, Walker submitted an affidavit dated March 6, 2000, from the restaurant owner, Reverend Williams; this

document post-dates Walker's 1996 trial. Because some of the evidence that Walker adduced in support of the police misconduct claim raised in the C.P.L. 440.10 motion was *dehors* the record; this contradicts the state court's assertion that Walker's police misconduct claim was only based on grand jury testimony, trial testimony, and trial exhibits.

The rule consistently followed in New York is that claims based on matters *dehors* the appellate record are proper matter for collateral motions to vacate the judgment pursuant to C.P.L. 440.10 rather than for direct appeal. *See, e.g., People v. Harris*, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678, 687 (2d Dept. 1985); *People v. Brown*, 45 N.Y.2d 852 (1978). Furthermore, by its terms, C.P.L. § 440.10(2)(c) does not appear to apply to the present situation, since Walker *did* raise the claim on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c) ("Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his *unjustifiable failure* to raise such ground or issue upon an appeal actually perfected by him[.]") (emphasis supplied). Although there is another mandatory dismissal provision in C.P.L. § 440.10 that applies when a defendant has raised a claim on direct appeal and raises it again in a collateral motion, it appears to require that the issue must have been "previously determined on the merits upon an appeal from the judgment[.]" N.Y. Crim. Proc. Law § 440.10(2)(a). In Walker's case, however, the Appellate Division denied the police misconduct claim on procedural grounds–*i.e.*, C.P.L. § 470.05(2). *People v. Walker*, 275 A.D.2d at 1009.

There appears to be an issue as to whether the procedural rules actually relied upon by the

Appellate Division and by the trial court in Walker's case to reject the police misconduct claim are "firmly established and regularly followed" by the New York courts in other cases similar to Walker's. Thus, the issue of the "adequacy" of the procedural bars could be more complex to resolve than the underlying claim, which is easily disposed of the merits. For this reason, the Court recommends reviewing the substance of Walker's police misconduct claim and denying it as without merit. *See Dunham v. Travis*, 313 F.3d 724, 730) (2d Cir. 2002) ("[I]t is not the case 'that the procedural-bar issue must invariably be resolved first . . . . [H]urdling the procedural questions to reach the merits of a habeas petition is justified in rare situations, 'for example, if the [the underlying issue] were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.'" (quoting *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)); *see also Boddie v. New York State Div'n of Parole*,285 F. Supp.2d 421, 427 (S.D.N.Y. 2003) (quoting *Brown v. Thomas*, No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N.Y. Mar.10, 2003)).

Under any standard of review, Walker's claim of police misconduct is plainly insufficient to provide a basis for habeas relief. In essence, Walker accuses the police of conspiring to falsely accuse him, and he claims that Officer Maurice Grant, the victim's uncle, was the impetus for the alleged collusion. According to Walker, Officer Grant "went to the crime scene and paid an out of court settlement to the owner of the restaurant [Williams] for damages and to have charges dropped against his [Officer Grant's] nephew Darin Grant." Supp. Pet. at 1 (Dkt #1). Walker's theory is that this caused the police to discontinue their investigation of the burglary complaint filed by Williams regarding the damage to the restaurant caused by the victim and his friends during the altercation. *See*, *e.g.*, Petitioner's *Pro Se* Supplemental Appellate Brief ("Pet'r *Pro Se*

-27-

Supp. App. Br.") at 9, 11-13, 41, Resp't Ex. B; *see also* Petitioner's Affidavit in Support of

C.P.L. § 440.10 Motion at A16, submitted by respondent as unbound state court records. Walker

also asserts that the warrant for his arrest was "bogus" and the result of "police fraud and deals

made by false accusers' uncle which can be proven prima facie phases [sic] of polices' malicious

misconduct, fraud[.]" Petitioner's Affidavit in Support of C.P.L. § 440.10 Motion at A5. Walker

further accuses Officer Grant of being responsible for the incident itself and for preventing him

from successfully asserting a defense of justification at trial. *See* Petitioner's Affidavit in Support

of C.P.L. § 440.10 Motion at "A1(i)" (describing  altercation and alleging that Officer Maurice

Grant "did allow all of this to transpire and did in fact concentratively [sic] (prior to falsifying a

theory to arrest defendant) eliminate the justification defenses' elements" and "conceal[ed]" the

burglary complaint).

      It is true that Officer Grant was the victim's uncle and was on the force of the Buffalo

Police Department at the time of the incident.  Walker appears to be arguing that these facts,

combined with the monetary settlement supposedly paid by Officer Grant to Reverend Williams,

the restaurant owner, prove Officer Grant was responsible for allegedly derailing the

investigation into the burglary complaint and fabricating evidence to support Walker's arrest.

First of all, Reverend Williams' affidavit, standing alone, is insufficient to prove the existence of

the alleged monetary settlement. However, even were the Court to credit Williams' statements to

that effect, the Court cannot find that this establishes improper conduct on the part of the police

department in connection with its investigation into Walker's assault on the victim or the

burglary complaint regarding the damage to the restaurant. Walker's assertion that the police

improperly failed to investigate the burglary complaint is contradicted by Officer Lauber's

testimony at trial that he attempted to contact the restaurant owner and the restaurant manager on several occasions to talk to them about the burglary and the assault by the victim on Walker, but was told that they were not there or were too busy to talk to him. Officer Lauber also attempted to contact Walker's son, in order to find out more information about Grant's assault on Walker, but he never received a return phone call.

Furthermore, there is no evidence to suggest that Officer Grant was in any kind position of authority over the officers responsible for investigating the incident. Officer Lauber, who was charged with looking into the burglary complaint, testified at trial he was a member of the 11th Precinct, which was responsible for investigating both the assault by Walker and the burglary by the victim and his friends. Officer Grant, on the other hand, was a member of the 13th Precinct, and never had been a member of the 11th Precinct. It is interesting to note that one of Reverend Williams' relatives, his nephew, Officer Karl Flemming, was a member of the Buffalo Police Department's 11th Precinct at the time of the incident.  Walker's assertion that he was arrested and indicted in connection with the incident *solely*  based upon the alleged interference by Officer Grant is implausible, to say the least.

In the mountain of alleged documentary evidence[6] submitted in support of Walker's

---

[6]        In support of his claim of police misconduct in connection with the C.P.L. § 440.10 motion, Walker alleged that the victim's uncle, Officer Maurice Grant, "did in fact concentratively [sic] (prior to falsifying a theory to arrest defendant) eliminate the justification defenses' [sic] elements . . . along with concealing (to be ignored) Exhibits 705 and 695 by creating everything PO Lauber represents including the fabricated warrant[.] C.P.L. § 440.10 Motion at 2.  Exhibit 695 is a General Offense Report from the Buffalo Police Department filled out by Officer S. Howard. The narrative states, "Complt along w/ CO – Complt Willie Walker, 45 YOA, B/M of [ ], Ph# [ ]. States on above D,T, & L, Person known as Darren [sic] Grant B/M, 22 YOA, of [ ] (CO – Complt step-son). Along with five to six other B/M's unk. did force their way into Restaurant rear screen door, causing damage to same." Exhibit 705 is another General Offense Report; it was filled out by PO G. O'Shei. The narrative states, "On above D T & L victim [Darin Grant], while after entering POE (Mom's Diner, 1293 E. Delevan) of Willie Lee Walker (B/M DOB 05/04/73 – [ ]) and attempting to assault same while with 5 other B/Ms was stabbed several times by Willie Walker. Victim sustained stab wounds in the bac (mid & clavacle [sic]) left hand mouth & a collapsed lung. Victim was treated at ECMC hosp." Walker avers that the "[r]ecords [to support his C.P.L. § 440.10 motion]

claims of police misconduct, there are no concrete facts that lead logically and reasonably to the conclusion that the police committed any wrongdoing. Rather, it appears to this Court that Walker's claims of police misconduct are the product of his own speculative assumptions. The only "facts" he has established are that Officer Grant and the victim were related and that Officer Grant was on the police force at the time of the incident. Walker has not established that Officer Grant compensated the restaurant owner for the damage caused by the victim and his friends during the incident, but even if he could, that would not change the result. A factfinder would not reasonably conclude from these allegations that the criminal investigation regarding Walker's stabbing of the victim was the product of fraudulent conduct by the police; such a conclusion ignores the compelling evidence of Walker's culpability in assaulting Grant. *Cf. Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003) (stating that order to survive a motion for summary judgment on the malicious prosecution claim, plaintiff bears burden of submitting evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith; the presumption of probable cause cannot be rebutted with mere "conjecture" and "surmise" that his indictment was procured as a result of conduct undertaken by the defendants in bad faith). The Court finds it significant that Walker contends that there was "no probable cause showing why [he] should have ever been arrested," Pet'r App. Br. at 11, Resp't Ex. A, but he overlooks the fact that the grand jury's conclusion that probable cause existed to indict him was based, at least in part, on *his own testimony* before that body. He thus

---

are fully presented to reveal a (police) relatives' [sic] illegal acts to safeguard his nephews' [sic] malice . . . with and by the polices' [sic] self indulged intentional malice." *Id.* 4. The "indictment is based on fraud[;] police and some medical reports are fraud[;] perjury conjecture and fraud, etc. – all illegally caused trial conviction and sentencing[;] POM Grant could have cured the records – instead he and fellow officers CAUSED THEM etc – [and] defendants' [sic] imprisonment is in fact unlawful[.]" *Id.* at A-23.

has failed to meet his evidentiary burden of demonstrating any improprieties in the conduct of the police leading to his conviction. *Cf., e.g., Jenkins v. City of New York*, Nos. 98Civ. 7170 JGK DFE,1999 WL 782509, *11 (S.D.N.Y. Sept. 30, 1999) (malicious prosecution claim could not survive motion for summary judgment where plaintiff, apart from his own conclusory allegations of conspiracy, failed to produce any evidence of intentional police misconduct and his allegations were contradicted by the affidavits and contemporaneous documentary record in support of the motion); *Hill v. Melvin*, No. 05 Civ. 6645(AJP), 2006 WL 1749520, at * 14 (S.D.N.Y. June 27, 2006) (granting summary judgment dismissing malicious prosecution claim where petitioner presented no admissible evidence beyond his own testimony that the correction officer planted the razor which he was charged with illegally possessing; plaintiff need to present more than "'mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith " to rebut the presumption of probable cause") (quoting *Reid v. City of New York*, No. 00 Civ. 5164(RCC)(JCF), 2004 WL 626228 at *7 (quoting *Savino v. City of New York*, 331 F.3d at 73) and citing, *inter alia*, *Simmons v. New York City Police Dep't*, 97 Fed. Appx. 341, 343 (2d Cir. 2004) ("Although [plaintiff] testified that the arresting officer . . . told him that the officers would falsify evidence and manipulate line-ups in order to implicate him, this allegation is not, without more, sufficient to raise an inference that the indictment was procured by fraud or bad faith conduct.")). Accordingly, the Court recommends that Walker's claim of police misconduct should be dismissed as being without merit.

### B.    Prosecutorial Misconduct

Walker alleges that the prosecutor committed several instances of misconduct in connection with his presentation of the case to the grand jury, namely that he failed to "charge"

the "keys, the principal facts . . . in the indictment"; failed to produce evidence at the grand jury

that petitioner "had stole [sic] the family car of that the apartment keys being retrieved [by the

victim] were not [petitioner's]; and suborned perjury in the grand jury when the victim

purportedly testified "that a stolen car report had been filed."*See* Supp. Pet. at 2-4 (Dkt #1).

Walker also asserts that the prosecutor improperly introduced at trial certain photographs of the

crime scene which he allegedly "knew misrepresented facts." *See* Supp. Pet. at (Dkt. #1). In

addition, he asserts a claim under the Sixth Amendment's Confrontation Clause based on the

prosecutor's failure to make "reasonable good faith efforts to secure attendance of a witness who

is under their control and has some material and relevant information to impart." Supp. Pet. at 2

(Dkt. #1). Walker raised all of these claims on direct appeal, and the Appellate Division held that

they were unpreserved for review. Respondent argues that the foregoing claims are procedurally

defaulted as a result and, in any event, without merit or not cognizable on federal habeas review.

*See* Resp't Mem. at 10-12 (Dkt. #6).

In addition, Walker, for the first time in his habeas petition, has asserted a claim that the

prosecutor violated his disclosure obligations pursuant to *Brady v. Maryland*, 373 U.S. 83

(1963), because he failed to turn over to the defense certain items of allegedly exculpatory and

material evidence. Respondent argues that this claim is unexhausted because Walker failed to

raise it in state court and that it also is without merit because petitioner "has entirely failed to

show the existence of *Brady* material that the prosecutor failed to disclose." Resp't Mem. at 13

(Dkt. #6). The Court will discuss Walker's separate grounds alleging prosecutorial misconduct,

and respondent's arguments opposing them, in turn below.

### 1.       Prosecutorial Misconduct in the Grand Jury and at Trial

The Appellate Division rejected Walker's claims of prosecutorial misconduct and at trial as unpreserved due to Walker's failure to timely object at trial as required by C.P.L. § 470.05(2). Respondent correctly argues that this holding represents an adequate and independent state ground barring further habeas review. The Appellate Division's reliance upon C.P.L. § 470.05(2), which required Walker to specifically object to the alleged instances of prosecutorial misconduct at trial in order to preserve the alleged misconduct for appellate review, was an independent basis for its decision. It also was a fully adequate basis for the state court's decision rejecting Walker's claims of prosecutorial misconduct as unpreserved since it is settled law in New York state that in order to preserve for appellate review a claim that a prosecutor committed misconduct before the grand jury or at trial, a defendant must register a timely, specific objection to each instance of impropriety with the trial court pursuant to C.P.L. § 470.05(2). The defendant's failure to do so renders the claims unpreserved and leaves the appellate court no basis to review the alleged prosecutorial misconduct. *E.g.*, *People v. Williams*, 8 N.Y.3d 854, 855 (N.Y. 2007); *People v. Miles*, 36 A.D.3d 1021, 27 N.Y.S.2d 348, 351 (App. Div. 3d Dept. 2007); *People v. Davenport*, 35 A.D.3d 1277, 825 N.Y.S.2d 864, 865 (App. Div. 4th Dept. 2006); *People v. Aponte*, 28 A.D.3d 672, 813 N.Y.S.2d 224, 225 (App. Div. 2d Dept. 2006); *People v. Jackson*, 304 A.D.2d 327, 328, 756 N.Y.S.2d 580, 582 (App. Div. 1st Dept. 2003).

New York appellate courts consistently demand strict compliance with C.P.L. § 470.05(2), the contemporaneous objection rule, as the foregoing New York precedent makes clear. Furthermore, Walker completely failed to comply with the procedural rule. *See id.* Walker has asserted no reasons–and the Court sees none on the record–why he should have been excused from complying with the rule at trial in the circumstances presented here. *See id.* Thus, the

procedural bar relied upon by the appellate court in this case was "firmly established and regularly followed," and therefore constitutes an independent and adequate state ground barring review of the merits of Walker's claim. *Accord Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) (holding that appellate division rejected petitioner's claim of prosecutorial misconduct on an adequate and independent state ground where it ruled that because petitioner did not object to the prosecutor's racist remarks, he did not preserve the argument for review, and then went on to discuss the merits of the due process claim); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (same); *Jenkins v. Unger*, No. 9:03-CV-1172 (LEK/DRH), 2007 WL 911889, *11 (N.D.N.Y. Mar. 22, 2007) (appellate division rejected petitioner's prosecutorial misconduct claim, stating that "his claims of prosecutorial misconduct, based upon the elicitation of certain testimony and summation remarks, were not preserved by appropriate objection[;]" holding that New York's contemporaneous objection rule was an "adequate and independent" state ground for procedural default where defense counsel has failed to object to a prosecutor's misconduct").

The Court next must determine whether there exists "cause" to excuse the procedural default of the prosecutorial misconduct claims or "prejudice" attributable thereto. Walker has not alleged either, and none is apparent to the Court after its review of the trial record. Accordingly, Walker cannot meet the "cause and prejudice" exception to the procedural bar created by the state court's reliance upon an adequate and independent state ground to dismiss his claim regarding the prosecutor's alleged misconduct at trial and before the grand jury. *See Murray*, *v. Carrier*, 477 U.S. at 485. Nor can Walker take advantage of the "fundamental miscarriage of justice" exception, since he has not come forward with any new evidence that he is "actually innocent" of the crimes for which he was convicted. *See Schlup v. Delo*, 513 U.S. 298, 314-16

(1995). The Court recommends dismissing Walker's claims of prosecutorial misconduct in the grand jury proceeding and at trial as procedurally barred from federal habeas review.

Furthermore, the Court recommends dismissing the claims of alleged prosecutorial misconduct in the grand jury as not cognizable on federal habeas review. Apart from the fact that Walker has failed to establish that any prosecutorial misconduct in fact occurred with respect to the presentation of his case to the grand jury, to the extent that Walker is asserting defects in that proceeding, such a claim is not cognizable on habeas review because Walker was convicted after a jury trial. *See United States v. Mechanik*, 475 U.S. 66, 68 (1986); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989). In the context of an attack on a federal grand jury proceeding, the *Mechanik* court stated:

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

475 U.S. at 70. Following the reasoning of *Mechanik*, the Second Circuit has held that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court." *Lopez*, 865 F.2d at 32. The foregoing precedent compels the conclusion that any alleged deficiencies in the grand jury proceeding caused were cured by his conviction by the petit jury. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (holding that habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" . . . were

"cured in the trial before the petit jury, which convicted"). Accordingly, the Court recommends dismissing the claims of prosecutorial misconduct in the grand jury as not cognizable on habeas review.

With respect to Walker's claims of alleged prosecutorial misconduct at trial (*i.e.*, the erroneous introduction of misleading photographs and the failure to present material witnesses), the Court recommends also dismissing them as without merit.  Turning first to Walker's claim regarding the prosecutor's failure to call "material witnesses," Walker characterizes this claim in his habeas petition as a "missing witness" claim but he uses language from Supreme Court cases addressing the Sixth Amendment right to compulsory process. On direct appeal, Walker argued the facts of this claim using a Sixth Amendment analysis, asserting that he was denied his right to compulsory process due to the prosecutor's failure to produce certain witnesses. Therefore, the Court will analyze the claim under the rubric of the Sixth Amendment right to compulsory process for calling witnesses in his favor.

The Sixth Amendment right to present a defense is one of the "minimum essentials of a fair trial," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and it is violated when a state "arbitrarily denie[s] [a defendant] the opportunity to put on the stand a witness . . . whose testimony would be "relevant and material to the defense," *Washington v. Texas*, 388 U.S. 14, 23 (1967). Unless a witness is in the control of state authorities, however, neither the prosecutor nor the court has any obligation to secure his or her presence as a defense witness. *Jacobson v. Henderson*, 765 F.2d 12, 16 (2d Cir. 1985).

The two witnesses whom Walker faults the prosecutor for not calling are Sharon Grant and Officer Noreen Walsh. Sharon Grant was the victim's mother as well as Walker's ex-wife; at

the time of the incident, she and Walker were living together although they were divorced.

Walker has not alleged, and there is no basis whatever for finding, that Sharon Grant was "under

the control of state authorities," *Jacobson*, 765 F.2d at 16. Therefore, neither the prosecutor nor

the trial court had any obligation to secure Sharon Grant's presence as a defense witness, *id.* With

respect to Officer Walsh, it is true that she was in the employ of the Buffalo Police Department

and under control of the prosecution. However, the Court notes that, in the record, there are

judicial subpoenas *ad testificandum* for both Grant and Walsh signed by defense counsel. There

is no indication in the record as to whether either *subpoena* was served. Thus, Walker was not

denied his right to compulsory process with respect to these witnesses since defense counsel

obtained subpoenas signed by the trial judge compelling the witnesses' attendance at trial.

Petitioner cannot now be heard to argue that the prosecutor denied him his opportunity to put

those witnesses on the stand. Although whether or not the subpoenas were served was not

explained in the record, defense counsel nevertheless was afforded the opportunity to procure the

witnesses' attendance.

Moreover, the right to compulsory process exists only where a defendant "make[s] some

plausible showing of how [the desired witness'] testimony would have been both material and

favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  The

Supreme Court has observed that "more than the mere absence of testimony is necessary to

establish a violation of the right" to compulsory process. *Id.* (citing *Washington v. Texas*, 388

U.S. at 19). In *Valenzuela-Bernal*, the Supreme Court read the Sixth Amendment to limit, by its

own terms, which witnesses are covered by the right to compulsory process; the Sixth

Amendment does not grant to a criminal defendant the right to secure the attendance and

testimony of any and all witnesses but rather guarantees him "compulsory process for obtaining witnesses in his favor," U.S. CONST., Amend. 6. In *Washington v. Texas*, the Supreme Court found the compulsory process clause violated when the defendant was "arbitrarily deprived of 'testimony [that] would have been relevant and material, and . . .  vital to the defense.'" 388 U.S. at 16. The Supreme Court in *Valenzuela-Berna* relied upon this language and held that in order to establish a violation of the constitutional right to compulsory process a defendant "must at least make some plausible showing" of how the witness' testimony would have been "both material and favorable" to the defense. 458 U.S. at 867; *accord*, *e.g.*, *United States v. Korodgodsky*, 4 F. Supp.2d 262, 268 (S.D.N.Y. 1998) (rejecting Compulsory Process claim where petitioner failed to show that the proposed witnesses' testimony would be either material or favorable to his defense).

Walker has failed to demonstrate that Sharon Grant had any "material" testimony to give; he merely asserts that she would have testified regarding the victim's alleged "hate and animosity" towards him. Assuming for the sake of argument that Sharon Grant would have testified that the victim disliked Walker, such evidence of bias might have permitted Walker to argue  that Grant was the first aggressor possessed of "hate and animosity" toward Walker. Because of the victim's of "hate and animosity" toward Walker, his attack was fierce enough to justify the force that he, Walker, used to repel it. However, as stated above, the prosecution had no obligation to produce Sharon Grant. Moreover, she had been subpoenaed and there is no indication on the record why she did not testify. Nevertheless, even had she testified, the excessive force used by Walker in repelling the assault by the victim was of such a violent and dangerous nature that it would have neutralized any favorable effect of her testimony, and it

would not have been helpful. Thus, there is no basis for finding that Sharon Grant's testimony
would have been "material" to the defense.

Similarly, with respect to Officer Walsh, there is no indication that she would have
testified favorably to the defense. Walker asserts that Officer Walsh "was the officer who took
the defendants [sic] statement during the crime scene investigation which is the defendants [sic]
testimony given before the Grand Jury." *See* Supp. Pet. at 3 (Dkt. #1). Walker contends that
Officer Walsh was the "only officer" that he remembers "giving a statement to in complete form
of his story as to what happen[ed][.]" Pet'r *Pro Se* App. Br. at 27, Resp't Ex. B. However,
Walker has not explained how either his grand jury testimony or his statements to the police were
favorable to him. Indeed, Walker's own summary of his statements to the police, which is
discussed further elsewhere in this Report and Recommendation in connection with his *Miranda*
claim, shows that he admitted that he "may have" stabbed the victim.

In short, Walker's claim that he was denied his Sixth Amendment right to compulsory
process is without merit. Most important, he obtained compulsory process for calling these
witnesses as part of his own defense. Moreover, there is no indication on the record that Walsh
was even served with the subpoena, or that their failure to testify was in any way the product of
obstruction, a refusal to produce, or lack of cooperation on the part of the prosecution.  For these
reasons, the Court recommends dismissing the claims regarding the prosecutor's failure to call
Sharon Grant and Officer Noreen Walsh as without merit.

Walker's other claim of alleged prosecutorial misconduct occurring at trial is premised on
the alleged introduction of "false and misleading" photographs. Walker complains that certain
photographs of the crime scene introduced as prosecution exhibits "distorted images of factual

features" and were taken seven months after the actual incident. Pet'r *Pro Se* Supp. App. Br. at 33-34, Resp't Ex. B.  The Court notes that on the defense case, Walker testified from photographs taken by the defense investigator nine months after the incident. In any event, however, Walker has failed to demonstrate that the photographs at issue did not fairly and accurately depict the interior of the restaurant. He asserts the photographs introduced by the prosecution were "false and misleading" because, for instance, they were taken during the daytime while the alleged assault occurred at 2:00 a.m.; individuals in the photographs "had their backs turned"; the restaurant was "open for business" in the photographs; the "'knife' used a demonstrative model had been 'carefully' positioned halfway out of the rack"; and the prosecutor's gloves and legal folder were on the counter. *See id.* None of these alleged "changed conditions" had any bearing on the issues relevant to Walker's defense. Walker therefore has failed to show why the photographs were inadmissible. *See*, *e.g.*, *Saporito v. City of New York*, 14 N.Y.2d 474, 477 (N.Y. 1964).

Moreover, even if it was error as a matter of state evidentiary law to admit the photographs, which the Court does not find to have been the case, Walker still would not be entitled to habeas relief. Trial court evidentiary rulings, even if erroneous, do not rise to the level of constitutional error sufficient to warrant habeas relief except "where the petitioner can show that the error deprived him of a *fundamentally fair* trial." *Rosario v. Kuhlman*, 839 F.2d 918 (2d Cir. 1988) (emphasis in the original; quotation omitted). To make the required showing, the petitioner must demonstrate that the improperly admitted evidence "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quotation omitted). As

respondent notes, the photographs at issue here merely were used to give the jury a basic understanding of the layout of the interior of the restaurant where the assault occurred. Resp't Mem. at 12 (citing T.60-64) (Dkt. #6). On the record before the Court, there is no basis for finding that the crime scene photographs removed a reasonable doubt that otherwise would have existed, or had any effect on or influence in determining the jury's verdict. *See Thomas v. Scully*, 854 F. Supp. 944, 955-56 (E.D.N.Y. 1994) (holding that even if admission of crime scene photographs was error, "a review of [the] entire record does not reveal that [their] admission 'had [a] substantial and injurious effect or influence in determining the jury's verdict'") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

### 2.    Violation of the Prosecutor's *Brady* Obligations

Walker contends that the prosecutor violated his disclosure obligations pursuant to *Brady v. Maryland*, *supra*, because he allegedly failed to turn over the following materials: (1) the "general offense report #058-705"; (2) "any prior statements from A. Clark or S. Akbar" made "prior to their grand jury testimony"; (3) "'any' statement made by Sharon Grant; (4) "the 911 calls made by A. Jones who made the first report of a crime in process"; and (5) "all the original evidence from the crime scene investigation conducted from the initial report charging Burglary, criminal mischief, force entry, and assault, which was charged against D. Grant. Which was never prosecuted." Supp. Pet. at 4-5 (Dkt. #1).  As respondent notes, Walker did not raise this claim in state court and it is therefore unexhausted. However, if Walker were to return to state court to attempt to exhaust the claim, he would face an absence of corrective process within the meaning of 28 U.S.C. § 2254(b). New York procedural rules plainly bar him from attempting to raise his prosecutorial misconduct claim before the New York Court of Appeals because he is

entitled to only one direct appeal of his conviction. Walker has already made the one request for

leave to appeal to which he is entitled; he cannot again seek leave to appeal these claims in the

Court of Appeals. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (citing N.Y. Court Rules §

500.10(a) (providing that a defendant in New York has only one direct appeal)). If Walker were

attempt to raise the claim in support of another motion for *vacatur* under C.P.L. § 440.10, the

trial court would be mandated to deny it under C.P.L. § 440.10(2)(c) because it was a record-

based claim that could have been decided on Walker's direct appeal. *See id.* (citing N.Y. Crim.

Proc. Law § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when . . .

sufficient facts appear on the record of the proceedings . . . to have permitted, upon appeal from

such judgment, adequate review of the ground or issue raised upon the motion, [but] no such

appellate review . . . occurred owing to the defendant's . . . unjustifiable failure to raise such

ground or issue upon an appeal[.]")).

 Walker no longer has "remedies available" in the New York state courts under 28 U.S.C.

§ 2254(b) because, as discussed, the state courts would reject his claims as procedurally

defaulted. This Court accordingly must deem the claims exhausted due the absence of state court

remedies. *Grey*, 933 F.2d at 121 (citing 28 U.S.C. § 2254(b); *see also Harris v. Reed*, 489 U.S. at

263 n. 9; *Engle v. Isaac*, 456 U.S. at 125-26 n. 28). However, the "procedural bar that gives rise

to exhaustion provides an independent and adequate state-law ground for the conviction and

sentence, and thus prevents federal habeas corpus review of the defaulted claim," *Gray v.

Netherland*, 518 U.S. 152, 162 (1996). Unless Walker can demonstrate cause for the procedural

default of his *Brady* claim and prejudice resulting therefrom, or that the failure to consider the

claim would result in a fundamental miscarriage of justice, *Grey*, 933 F.2d at 121 (citing *Murray*

*v. Carrier*, 477 U.S. at 492; *Wainwright v. Syes*, 433 U.S. at 87-91), the claim should be barred from federal habeas review.

Here, Walker has not alleged cause or prejudice in his pleadings submitted in connection with his habeas petition, and the Court has found neither on the record before it. Furthermore, Walker has not made the factual showing of "actual innocence" necessary to warrant the "fundamental miscarriage of justice" exception to the procedural default rule. *See Schlup v. Delo*, 513 U.S. at 314-16. Accordingly, the Court recommends finding that Walker's prosecutorial misconduct claim based on the alleged failure to disclose *Brady* material should be dismissed as procedurally barred from federal habeas review.

In the alternative, the Court recommends dismissing the *Brady* claim on the merits because Walker cannot establish the required components of a true *Brady* violation–that the undisclosed evidence must have been favorable to the accused; the state must have suppressed the evidence, either wilfully or inadvertently; and prejudice to the petitioner must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Evidence is favorable to the accused if it either tends to show the accused is not guilty or impeaches a prosecution witness." *Boyette v. LeFevre*, 246 F.3d 76, 90 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Prejudice, in the *Brady* context, requires a showing that there is a "reasonable probability" that the outcome of the trial would have been favorable to petitioner, had the material been disclosed. *Bagley*, 473 U.S. at 682 ("The suppression of exculpatory documents does not cause a constitutional violation unless the documents are material, *i.e.*, 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"); *accord*, *e.g.*, *Boyette*, 246 F.2d at 90.

The first item of alleged *Brady* material is General Offense Report #058-705, completed

by Officer O'Shei of the Buffalo Police Department. As an initial matter, the Court questions

whether this document actually was suppressed since Walker faults trial counsel for failing to

properly examine one of the police officers about this very report. Based on this claim, one

would assume that trial counsel had the report but then failed to use it.  In any event, Report

#058-705 is an investigative report summarizing the assault on the victim, Darin Grant. The

narrative reads, in pertinent part, as follows:

> Victim, while after entering POE . . . of Willie Lee Walker . . . and attempting to
> assault same while with 5 other B/Ms was stabbed several times by Willie
> Walker. Victim sustained stab wounds in the back (mid and clavacle [sic]) left
> hand mouth & a collapsed lung. Victim was treated at ECMC hosp.

General Offense Report #058-705, attached to Pet'r Mot. Expand Record (Dkt. #10). Walker

asserts that it "cooperates [sic] the defendant's story completely," presumably on the basis that

the report acknowledges the victim attempted to assault Walker and that he was accompanied by

five other individuals. The Court notes defense counsel had received information to this effect

from Walker based on the defense investigator's interview with him in July 1996. Eyewitness

and defense witness Andrea Jones said that there was a "group of youths" and did not identify

how many; however, she informed the defense investigator that she had seen all of them at one

time or another and that their photographs were posted in the restaurant in a gallery of patrons'

photographs. Thus, Walker already had more information from his witness Jones than was

contained in the general offense report. In any event, even assuming the report contained

exculpatory information because it tended to support petitioner's contention that he reasonably

believed he needed to use deadly force since he was being attacked by six individuals, it

nevertheless was not "material" for purposes of a *Brady* violation. There is no reasonable probability that the outcome of the trial would have been different had this report been disclosed. Whether Walker was initially attacked by three individuals or seven, the fact remains that the prosecution presented overwhelming evidence that he stabbed the victim in the back as the victim was running out the door and was no longer a threat to him.

Walker identifies the second item of alleged *Brady* material as "any prior statements from A. Clark or S. Akbar prior to their grand jury testimony[.]" However, Walker he has failed to demonstrate the existence of any statements made by Clark and Akbar. Nor has Walker suggested how these witnesses' statements, if any, would have been favorable to the defense. Indeed, Clark and Akbar testified without impeachment for the prosecution at trial, corroborating Grant's version of events. Walker's inability to establish that Clark and Akbar actually made any statements before they testified in the grand jury is fatal to his *Brady* claim. Similarly, with regard to the third item of alleged *Brady* material, described by Walker "'any' statement made by Sharon Grant[,]" Walker has failed to establish that the victim's mother, Sharon Grant, in fact made any statements regarding the incident. Indeed, she was not even present during the assault. Having failed to demonstrate the existence of any statements by Sharon Grant, that aspect of Walker's *Brady* claim also must fail.

The fourth item of allegedly withheld exculpatory material is the recording of the 911 call made by restaurant manager and defense witness Andrea Jones at the time of the incident on March 29, 1996. The Court notes that defense counsel made a general request for *Brady* material his pretrial omnibus motion dated July 3, 1996. *See* Defendant's Omnibus Motion at 4-5, submitted as original state court records by respondent. On July 15, 1996, in his report to defense

counsel, the defense investigator noted that "as a point of information, the 911 office no longer

keeps tapes for 6 months. They are now erasing after 1 month." *See* Report of Roger Putnam

dated 7/15/96, Ex. 7 to Pet'r Motion to Expand Record (Dkt. #1). The prosecutor, in his affidavit

responding to defense counsel's omnibus motion, indicated that "the People have made a request

for a copy of any 911 tapes relative to this case. If 911 tapes are provided to the People, a copy of

these tapes will be provided under discovery to the defendant." People's Affidavit, ¶55,

submitted as original state court records by respondent.

Based on the documentation submitted by Walker in connection with his habeas petition,

it appears that the 911 call was recorded, but the audiotape was deleted at some point prior to

Walker's trial pursuant to a change in the Buffalo Police Department's retention policies. On

March 14, 2000, Walker received a letter from the Buffalo Police Department in connection with

his request for the tape-recording of the 911 call under the Freedom of Information Law. The

letter read, in pertinent part, as follows:

> I have prepared a new order for submission to [Erie County Supreme] Court
> identifying the date of the call you are seeking as March 29, 1996. . . .
> Unfortunately, the correction in the order will not change the outcome of your
> request. In my original letter to you, I indicated that the 911 recording system
> changed about June 1, 1994, and tapes before that date were no longer available
> unless someone requested their preservation within ninety days of the recording
> date. In double-checking with our 911 transcriber after talking with Justice
> Buscaglia's chambers, I have found that the date of the change was June 1, 1996,
> or more precisely, on May 10, 1996. *Calls recorded on that date and after are*
> *available, while calls recorded before that date no longer exist unless they were*
> *specifically preserved.* I have personally checked the closet where the old 911
> tapes are stored, and there is no tape for May 29, 1996. Therefore, the Buffalo
> Police Department cannot produce any recordings made on that date.

Letter from Buffalo Police Department dated 3/14/00 (emphasis supplied), Ex. 6 to Dkt. #15.  It

is unclear, based on the above letter, when requests to preserve 911 calls made before the date of the retention-policy change had to have been made. Nor is it clear from the People's affidavit when the prosecution requested a copy of the recording of the 911 tape. In any event, it appears that the requested tape of the 911 recording no longer existed at the time of defense counsel's request for *Brady* material in July 1996.

The failure to preserve the 911 tape-recording, without more, does not necessarily establish that petitioner's due process rights under *Brady* were violated. As noted above, Walker must demonstrate that the evidence was exculpatory or impeaching, that is was suppressed by the state either in bad faith or inadvertently, and that it was "material" in that its nondisclosure resulted in prejudice to the defense. *Strickler v. Greene*, 527 U.S. at 280. Exculpatory evidence is considered material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Bagley*, 473 U.S. at 682). Thus, "there is never a real '*Brady* violation' unless the [prosecutor's] nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. The Supreme Court has described "material" evidence as that which "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (citations omitted); *accord United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).

Even accepting the premise that there was an inadvertent "suppression" of the 911 tape-recording by the prosecution due to its failure to request its preservation at the time that the incident occurred, Walker cannot establish a *Brady* violation because the 911 call was not "material." Jones, the restaurant manager, called 911 from a payphone after she left the

restaurant. Walker does not explain in his habeas pleadings how the 911 tape was exculpatory, let alone how its introduction would have probably resulted in a more favorable verdict for him. Presumably, Walker's argument as to how the 911 call would have been exculpatory is that an urgent, excited call from an eyewitness asking for police assistance and making spontaneous statements relating the aggression by the victim and his associates against Walker would have tended to support the legitimacy of Walker's justification defense. Even accepting that the tape-recording of the 911 call was potentially exculpatory, the Court cannot find that there is a reasonable probability that the jury would have accepted Walker's justification defense had the recording been admitted.

Assuming *arguendo* that the evidence would have supported a finding that petitioner reasonably believed that he needed to resort to deadly physical force against the victim, it would not have altered the outcome of the trial. The prosecution presented extremely compelling medical and forensic evidence that petitioner stabbed the victim twice in the back as the victim was running away from petitioner out the door. Presented with this proof, there is no reasonable probability that a rational jury would have found, on those facts, that petitioner reasonably believed that he needed to continued to use deadly force against the victim: At the time petitioner inflicted the stab wounds in the victim's back, the victim–who was unarmed throughout the entire incident–was retreating and no longer posed a threat to petitioner. Thus, petitioner has failed to show that this allegedly favorable evidence could "reasonably be taken to put the whole case in such a different light," *Kyles*, 514 U.S. at 435, so as to "undermine [this Court's] confidence in the verdict." *id.*

To the extent that Walker may be alleging a claim under *Youngblood v. Arizona*, 488 U.S.

51, 58 (1988), based on the prosecution's failure to preserve the tape-recording of the 911 call,

the Court recommends finding that it is without merit. When the state suppresses or conceals

"material" exculpatory or impeachment evidence, the good or bad faith of the prosecutor is

irrelevant. *Illinois v. Fisher*,  540 U.S. 544, 547 (2004) (citing *Brady v. Maryland*, 373 U.S. at

87; *United States v. Agurs*, 427 U.S. 97 (1976)). If the state fails to preserve evidence that is only

"potentially useful" to the defendant, on the other hand, this failure does not violate the

defendant's due process rights unless the defendant can demonstrate bad faith on the part of the

state. *Illinois v. Fisher*, 540 U.S. at 547-48 (citing *Arizona v. Youngblood*, 488 U.S. at 58

("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve

potentially useful evidence does not constitute a denial of due process of law.")). Although

Walker has alleged bad faith and malice on the part of the police department and district

attorney's office from the beginning of the institution of the criminal proceeding against him, he

has not come close to substantiating any of these allegations and he certainly has not

demonstrated that the erasure of the tape-recording of the 911 call was motivated by bad faith on

the part of the district attorney. To the contrary, the record establishes that the prosecution made

a request for a copy of the tape, and indicated that to defense counsel. However, as the letter from

the Buffalo Police Department dated March 14, 2000, to petitioner, shows that there was a

change in the retention policy regarding 911 tapes on May 10, 1996. Calls recorded on that date

and after were available, but calls recorded before that date were not preserved unless there was a

specific request. Here, the prosecutor made a specific request for the tape of the 911 call, but, due

to the intervening change in the police department's retention policy, the request apparently was

not made in time for tape to have been preserved. Beyond the mere fact that the prosecutor's

request to preserve the 911 tape apparently was not made at the time of the incident, petitioner

has come forward with no other specific allegations that would tend to support an inference of

bad faith. Nor has he presented any authority for the proposition that a delay in requesting

preservation of evidence, without more, is evidence of bad faith. Under the circumstances here,

the Court cannot find that any delay in requesting the tape gives rise to an inference of bad faith

by the prosecutor. *See Campbell v. Greene*, 440 F. Supp.2d 125, 154 (N.D.N.Y. 2006) (finding

no "bad faith" on the part of the prosecution where the record established that such tape-

recordings of 911 calls were erased in light of the standard practice of the authorities to only

maintain such recordings for a period of thirty days absent a specific request for a copy of a

recording made prior to its erasure); *Brock v. Donelly*, No. 03 Civ. 2594(DC), 2004 WL 895632,

*11 (S.D.N.Y. Apr. 26, 2004) ("First, petitioner can only speculate that the tape contained

exculpatory information. Second, because the 911 tape was only 'potentially useful,' petitioner is

required to demonstrate that the prosecution acted in bad faith. *See Illinois v. Fisher*, [540 U.S.

544, 547]. The 911 tape, however, was erased by the transit police in accordance with its routine

practice. Therefore, the circumstances of its destruction do not give rise to an inference of bad

faith."). Therefore, the Court recommends finding, to the extent that Walker alleges that his due

process rights were violated under *Youngblood v. Arizona* because the prosecution acted in "bad

faith" by failing to preserve the 911 tape, that the claim be dismissed as without merit.

The fifth, and last item of alleged *Brady* material comprises "all the original evidence

from the crime scene investigation conducted from the initial report charging burglary, criminal

mischief, force [sic] entry, and assault, which was charged against D. Grant [and] which was

never prosecuted." Supp. Pet. at 4-5 (Dkt. #1). That is the extent of Walker's argument on this

aspect of his *Brady* claim; he does not specify what this "original evidence" is, let alone how it has any relevance to his case. The Court recommends that this claim be dismissed because it is based on an insufficiently factual basis and is too vague to state a colorable claim for relief.

However, even construing Walker's papers to raise the strongest argument they could possibly suggest, he has not established a *Brady* violation based on these allegations. Walker appears to be contending that the allegedly withheld evidence would have demonstrated that Grant should have been charged with a crime arising out of the incident and therefore was the aggressor in the incident, thereby bolstering Walker's justification defense. However, this argument still fails to establish the materiality of the alleged evidence under the *Bagley* test, which requires "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 435. Here, the information at issue–assuming for the sake of argument that it existed–only would have been relevant to the issue of establishing that Grant, the victim, was the aggressor. For all of the reasons given above in the context of the discussion of the other items of alleged *Brady* information, there is no reasonable probability that the outcome of petitioner's would have been different had this alleged "original evidence" been turned over to the defense. This aspect of Walker's *Brady* claim should be dismissed.

### C.     Admission of Petitioner's Statements to Police in Violation of *Miranda v. Arizona*

Walker contends that statements he made to Officer O'Shei while he was at the hospital should have been suppressed because they were the product of a custodial interrogation which began before he was advised of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436

(1966). When Walker raised this argument in his *pro se* supplemental brief submitted on direct

appeal, the appellate division held that the claim was unpreserved for review. *People v. Walker*,

275 A.D.2d at 1009 (citing N.Y. Crim. Proc. Law § 470.05(2) ("For purposes of appeal, a

question of law with respect to a ruling or instruction of a criminal court during a trial or

proceeding is presented when a protest thereto was registered, by the party claiming error, at the

time of such ruling or instruction or at any subsequent time when the court had an opportunity of

effectively changing the same. . . .")).

      In the present case, as to the *Miranda* claim, there is no doubt that New York's

contemporaneous objection rule, codified at C.P.L. § 470.05(2), constituted an "independent"

state ground for the Appellate Division's decision.  The question of the asserted procedural bar's

"adequacy" which entails asking whether it is a "firmly established and regularly followed rule"

in New York that a defendant must "contemporaneously object" at trial, pursuant to C.P.L. §

470.05(2), in order to preserve a claim that his statements to the police were made in the absence

of a valid waiver under *Miranda*.

      The Court, in its research, has not been able to uncover any appellate-level cases in New

York in which the courts relied upon C.P.L. § 470.05(2) to hold that a defendant can preserve a

*Miranda* claim by simply making a "contemporaneous objection." Rather, the "firmly established

and regularly followed rule," *Lee*, 534 U.S. at 386, in New York is that a defendant who wishes

to challenge the admissibility of statements made to the police first must seek to have them

suppressed by moving for a hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (N.Y. 1965)*,*

and then must raise each specific argument against admissibility before the hearing court, *id.* at

78.  Failure to specifically place it for disposition before the suppression court renders the

argument unpreserved and leaves no basis for appellate review. *People v. Vasquez*, 66 N.Y.2d 968, 970 (N.Y. 1985), *cert. denied*, 475 U.S. 1109 (1986); *accord, e.g.*, *People v. Jacquin*, 71 N.Y.2d 825, 826 (N.Y. 1988); *People v. Thompson*, 27 A.D.3d 495, (App. Div. 4th Dept. 2005) ("Defendant failed to preserve for our review his contention that his pre-*Miranda* conversation with the police constituted custodial interrogation by failing to raise that specific contention in his motion papers or at the hearing[.]"); *People v. Caballero*, 23 A.D.3d 1031, 1032 (App. Div. 4th Dept. 2005) (same); *People v. Santana*, 235 A.D.2d 220, 220 (App. Div. 1st Dept. 1997) (same); *People v. Brown*, 195 A.D.2d 1055, 1055 (App. Div. 4th Dept. 1993) (same). Because there appears to be an issue as to whether the rule actually relied upon by the Appellate Division in Walker's case to reject the *Miranda* claim as unpreserved is "firmly established and regularly followed," the issue of the "adequacy" of the procedural bar potentially could be more problematic to resolve than the underlying claim, which is easily disposed of on the merits. For this reason, the Court recommends reviewing the substance of Walker's claim and denying it as without merit. *See Dunham v. Travis*, 313 F.3d 724, 730) (2d Cir. 2002) ("[I]t is not the case 'that the procedural-bar issue must invariably be resolved first . . . . [H]urdling the procedural questions to reach the merits of a habeas petition is justified in rare situations, 'for example, if the [the underlying issue] were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.'" (quoting *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)); *see also Boddie v. New York State Div'n of Parole*, 285 F. Supp.2d 421, 427 (S.D.N.Y. 2003) (quoting *Brown v. Thomas*, No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N.Y. Mar. 10, 2003)).

    On the record before the Court, Walker cannot establish that his oral statements made to

the police officers while at the hospital immediately following the incident were obtained in violation of his constitutional rights under *Miranda v. Arizona*. Officer O'Shei testified that when he and his partner talked to Walker at the hospital, they were not sure what had happened to him, so they engaged him in a conversation to find out where his injury had come from. T.160. According to Officer O'Shei, Walker "made various statements regarding actions of himself and actions of . . . [the victim] . . . ." T.161. In particular, Walker said "I suspected I stabbed [the victim] because I swung and he fell back." T.162. At that point, Officer O'Shei testified, he stopped questioning Walker and read him the *Miranda* warnings. *See* T.161-68. Thereafter, Walker waived his rights and agreed to speak to the police. T.165.  Officer O'Shei testified that the conversations between Walker and the police officers were "pretty much identical . . . prior to and after the [*Miranda*] warnings were read." T.162. Petitioner's pre-waiver oral statements were not introduced into evidence, but Officer O'Shei read the post-waiver oral statements into the record at petitioner's trial, including petitioner's verbatim admission, "I picked up a knife and swung back. I suspect I stabbed him [Grant] because he fell back." T.166-68. The pre-printed *Miranda* rights card, which Walker had initialed and dated, was introduced into evidence as well. T.163-64.

When he made the first oral statement inculpating himself in the stabbing, Walker had not been issued the *Miranda* warnings. However, a suspect is entitled to *Miranda* warnings only if he or she is interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102 (1995) (holding that courts must examine "the circumstances surrounding the interrogation," and ask whether, given those circumstances, a "reasonable person" would have felt "at liberty to terminate the interrogation and leave," in order to ascertain if defendant was "in custody");

accord *Parsad v. Geiner*, 337 F.3d 175, 181 (2d Cir. 2003). Here, the Court does not find that

Walker was in custody at the time he was interviewed by Officer O'Shei at the hospital. *See*, *e.g.*,

*Gren v. Greiner*, 275 F. Supp.2d 313 (E.D.N.Y. 2003) (holding that it was reasonable for the

state courts to conclude that a reasonable person in petitioner's circumstances would not have felt

himself to be in police custody, regardless of the subjective opinions of the police might have

been with respect to his status as a homicide suspect, where petitioner "was taken to a hospital,

accompanied by an officer who was as likely to view petitioner as a victim or a witness as he was

to view petitioner as a suspect"; he was not handcuffed to his bed; and guards were not stationed

in such a way that he was aware of their presence), *aff'd*, 89 Fed. Appx. 754 (2d Cir. Mar 3,

2004).  In any event, even if the first oral statements were made in the setting of a "custodial

interrogation," any error in the failure of the police to read the *Miranda* warnings was harmless

because these statements were not admitted against petitioner at trial.

Turning next to the issue of the admissibility of the second set of oral statements, the

record amply supports Officer O'Shei's testimony that he read the *Miranda* warnings to Walker,

that Walker knowingly and voluntarily agreed to speak to the police. The Court finds it

significant that in Walker's version of events, told in his *pro se* brief on direct appeal, he

concedes that the police read the *Miranda* warnings to him. According to Walker, the interview

with Officer O'Shei went as follows:

> Q.     How well do you know this Grant fellow?
> A.     He's my step-son[;] we live together.
> Q.     How many guys did it take to drag his ass out of the place.
> A.     I don't know[;] there were 5 or 6 guys with him.
> Q.     Well, what did happen down there?
>
> A.     They broke in and tried to take my keys, which they did.

> Q.     Do you know how this [G]rant fellow got stabbed in the back?
> A.     I may have did it[.] I had to use a knife to fight them off me."

Pet'r *Pro Se* Supp. App. Br. at 6-7, Resp't Ex. B. The foregoing excerpt is a direct quote from

Walker's *pro se* supplemental brief on direct appeal. According to Walker, one of the officers

"then read [him] his *Miranda* rights from a *Miranda* card and asked [him] to initial the card,

[and] after that, they vanished!" *Id.* at 7. Williams argues that "[t]he mere fact that he may have

answered some questions or volunteered some statement on his own does not deprive him of the

right to refrain from answering any further inquiries until he has consulted with an attorney and

thereafter consents to be questioned." Pet'r *Pro Se* Supp. App. Br. at 39 (citing *Miranda*, 384

U.S. 436, 444-45).  The Court finds it significant that in his version of events, Walker does not

state that he asked for an attorney at any time during or after the interview with the police officer.

Nor does Walker deny that he initialed the waiver card after being read the *Miranda* warnings.

Furthermore, his summary of the statements he gave to the police is essentially the same as that

testified to by Officer O'Shei. The only difference is that in Walker's version, the police

"vanished" after reading him the *Miranda* warnings. As this finds support only in Walker's self-

serving recitation of the facts, the Court declines to credit it and instead accepts Officer O'Shei's

testimony.

Walker has never asserted that his medical treatment precluded him from validly waiving

his *Miranda* rights.  Provided that "totality of the circumstances reveals both an uncoerced choice

and the requisite level of comprehension[.]" *Moran v. Burbine*, 475 U.S. 412, 421 (1986), the

case law makes clear that a seriously ill patient-even one confined to a hospital-may give such a

waiver of his *Miranda* rights. *See Pritchett v. Portuondo*, No. 02CIV0824(MBM)(GWG), 2003

WL 22472213 *6 (S.D.N.Y. Oct. 31, 2003) (holding that petitioner's *Miranda* waiver, made while in the hospital recovering from "serious injuries," was valid where hospital records supported police officers' testimony that they had received medical clearance to speak with petitioner who was mentally alert at the time of this interrogation and had been removed from the Intensive Care Unit; mere fact that petitioner was being administered medication did not show that he was unable to knowingly waive his *Miranda* rights) (citing *United States v. Cristobal*, 293 F.3d 134, 143-44 (4th Cir.), *cert. denied*, 537 U.S. 963 (2002); *Campaneria v. Reid*, 891 F.2d 1014, 1029 (2d Cir.1989), *cert. denied*, 499 U.S. 949 (1991); *United States v. Martin*, 781 F.2d 671, 673-74 (9th Cir.1985)) (Report and Recommendation), *adopted by Pritchett v. Superintendent, Shawangunk Corr. Fac.*, No. 02 Civ. 0824(MBM), 2004 WL 3623207 (S.D.N.Y. Mar. 1, 2004); *see also Ford v. Hoke*, No. CV-91-4093, 1994 WL 594283, at *6 (E.D.N.Y. Oct. 25, 1994). In the present case, the totality of the circumstances reveals that Walker possessed the requisite intelligence to understand the *Miranda* warnings, which he concedes were read to him by Officer O'Shei. Although he had suffered injuries during the incident, they were relatively minor–a laceration to his thumb and to the back of his head which required stitches. He did not require and had not been administered any pain medication, and he was not in any type of physical, mental, or emotional distress that would have prohibited him from being able to voluntarily and intelligently waive his rights. Despite the single, unsupported assertion in the form habeas petition that his "confession was coerced," Walker has never claimed elsewhere in his pleadings that he was threatened, coerced, or promised leniency in exchange for speaking with Officer O'Shei about the incident. Indeed, the record is devoid of any support for a claim of coercion.

Where, as here, a suspect's initial statements to the police made in the absence of *Miranda* warnings are nevertheless voluntary, his subsequent, post-*Miranda* statements are admissible, notwithstanding any alleged improper police tactics. *See Oregon v. Elstad*, 470 U.S. 298, 314 (1985). There is no basis for concluding that Walker's initial statements made in response to Officer O'Shei's questions were anything but voluntary. Therefore his later statement to the police, which followed a valid waiver of his rights under *Miranda*, was properly admissible. *See id.* Moreover, petitioner's pre- and post-*Miranda* statements were in all essential respects identical–Walker admitted culpability for the crime, stating that he picked up a knife and "suspected" that he stabbed the victim since the victim "fell back." Walker's claim of a *Miranda* violation should not provide a basis for habeas relief and should be dismissed.

> **D.      Erroneous Jury Instructions on Justification and Interested Witnesses
> ("Judicial Misconduct")**

> **1.      Jury Instruction on Justification**

In his habeas petition, Walker contends that the "trial judge failed to give a complete and correct charge on justification." *See* Supp. Pet. at 5 (Dkt. #1); *see also* Pet'r *Pro Se* Supp. App. Br., Resp't Ex. B. On direct appeal, appellate counsel also challenged the justification charge but did so on a different ground, arguing that it erroneously precluded the jury from considering the justification defense as to the assault charges if it found that petitioner was not guilty of attempted murder. *See* Pet'r App. Br. at 12, Resp't Ex. B. Appellate counsel argued that because the justification charge "informed the jury that it could not consider the justification defense unless it found appellant guilty of *all* the crimes charged[,]" it "precluded the jury from considering the justification defense as to the assault charges, if it found, as it did, that appellant

was not guilty of attempting to cause the death of [the victim]." *See id.*, Resp't Ex. B. In

opposition, the prosecution argued on direct appeal that the claim was unpreserved, it having

been raised for the first time on appeal. *See* People's App. Br. at 5 (citing N.Y. Crim. Proc. Law

§ 470.05(2)), Resp't Ex. B. In the alternative, the prosecution asserted that even if the charge

were erroneous, any "error was harmless since no reasonable view of the evidence supported the

charge in the first place[.]" *Id.* (citation omitted), Resp't Ex. B. The Appellate Division held that

Walker had failed to preserve that contention regarding the jury charge, *People v. Walker*, 275

A.D.2d at 1009 (citing N.Y. Crim. Proc. Law § 470.05(2)), and, in any event, the trial court's

justification charge "was proper," *id.* (citation omitted).

Respondent argues that the claim is procedurally defaulted because the Appellate

Division dismissed it as unpreserved due to petitioner's failure to timely object. The Court agrees

that the Appellate Division's rejection of the claim on the basis that it was unpreserved

constitutes an adequate and independent state ground. The Second Circuit has held that New

York's contemporaneous objection rule is an "adequate and independent" state ground for

procedural default where, as here, defense counsel has failed to timely  object to an allegedly

erroneous instruction. *Edwards v. Jones*, 720 F.2d 751, 754 (2d Cir. 1983) (petitioner failed to

object to state trial judge's instruction on the lesser included offense of manslaughter; on appeal,

the prosecution argued both that the claim was procedurally barred to the lack of

contemporaneous objection and without merit, and state appellate court affirmed without

opinion) (citing *Martinez v. Harris*, 675 F.2d 51, 55 (2d Cir.), *cert. denied*, 459 U.S. 849 (1982));

*accord*, *e.g.*, *Murray v. West*, No. 06 Civ. 3677(AJP), 2006 WL 3751294, at *16 (S.D.N.Y. Dec.

21, 2006) (citing, *inter alia*, *Franco v. Walsh*, 73 Fed. Appx. 517, 518 (2d Cir. 2003) (finding

petitioner's claim of an erroneous jury charge procedurally defaulted because "[n]o contemporaneous objection to the charge was lodged, and the Appellate Division found that the issue was therefore unpreserved")).

Walker has asserted that there is no procedural default since the Appellate Division ruled alternatively on the merits of the claim regarding the justification defense. The Second Circuit has clearly held to the contrary, however. "'[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.'" *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996) (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding."); *Wedra v. Lefevre*, 988 F.2d 334, 338-39 (2d Cir. 1993)).

Because there is an adequate and independent finding by the Appellate Division that Walker procedurally defaulted on his claims concerning the propriety of the trial court's jury instruction on the defense of justification, Walker must show in his habeas petition "cause for the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750.  Walker has not addressed the cause and prejudice requirement. Nor has he argued that a fundamental miscarriage of justice will occur should the claim not be reviewed on federal habeas. However, Walker has asserted that trial counsel "failed to . . . make exception to the judge's erroneous charge to the jury." He does not specify which aspect of the charge trial counsel should have objected to; the Court assumes that he is alleging that trial counsel was ineffective in failing to object to the trial

court's charge on all of the bases raised by Walker in his *pro se* appellate brief and by appellate counsel.

In certain circumstances, trial counsel's ineffectiveness in failing to properly preserve a claim for review in state court can constitute "cause" to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (Citing *Carrier*, 477 U.S. at 488-89).  Only performance by trial counsel which is so deficient as to violate the defendant's Sixth Amendment right to the effective assistance of counsel will suffice. *Id.* (citing *Carrier*, 477 U.S. at 488-89). To claim that attorney error excuses a procedural default, a habeas petitioner must have properly presented and exhausted the ineffective assistance of counsel claim in the state courts. *Id.* at 451-52. The Supreme Court held in *Carpenter* that if the ineffective assistance of counsel claim sought to be used as "cause" is itself procedurally barred, the petitioner separately must show that there is "cause" excusing said procedural default as well as prejudice resulting from the error. *Id.* at 452-53.

As noted above, Walker asserts in his Supplement to the Petition that trial counsel "failed to make . . . exception to the judge's erroneous charge to the jury." Supp. Pet. at 9 (Dkt. #1). However, he has not exhausted this particular aspect of his ineffective assistance of trial counsel claim. Although he asserted a multitude of errors on counsel's behalf in his *pro se* appellate brief, this claim was not among them. *See* Pet'r *Pro Se* Supp. App. Br. at 37-44, Resp't Ex. B. Because Walker has failed to give the state courts an opportunity to pass on the merit of the claim, it remains unexhausted.

Walker, however, faces an absence of corrective process were he to return to state court and attempt to exhaust the claim. Although Walker could raise this claim of ineffective

assistance in a collateral motion to vacate the judgment pursuant to C.P.L. § 440.10, that statute

contains a mandatory dismissal provision for claims that *could have been raised* on direct appeal

because sufficient facts to elucidate the claims appeared on the trial record, but the defendant

unjustifiably failed to raise them on appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c); *accord*

*Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) ("New York law requires a state court to deny

a motion to vacate a judgment based on a constitutional violation where the defendant

unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient

record."). Here, the basis for this ineffectiveness claim–trial counsel's failure to object to trial

court's jury charge on justification–was "particularly well-established in the trial record[,]" *Sweet*

*v. Bennett*, 353 F.3d at 140 (holding that alleged error that was the basis for objection was

well-established in the trial record where "[t]rial counsel plainly failed to object on inconsistency

grounds to charging the counts in the conjunctive"). The Court notes that Walker asserted other

ineffective assistance of counsel claims on direct appeal in his *pro se* supplemental appellate

brief, "so he cannot claim that he was consolidating all of his Sixth Amendment claims for one

collateral attack with the benefit of a new evidentiary record for those other claims." *Id.* Where,

as here, the trial record provided a sufficient basis for petitioner to argue his ineffective

assistance of trial counsel claim on direct appeal, the claim does "not fall within those exceptions

noted by the New York courts" held to necessitate collateral review on a C.P.L. § 440.10

application. *Id.* (citing *Reyes v. Keane*, 118 F.3d 136,139 (2d Cir. 1997) (holding that the trial

record provided a sufficient basis for the ineffective assistance claim on trial counsel's failure to

object to a jury charge); *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (ruling that C.P.L. §

440.10(2)(c) barred a collateral attack based on trial counsel's failure to argue that indictment

was multiplicitous and violated the constitutional prohibition against double jeopardy because

petitioner unjustifiably failed to raise the ineffective assistance issue on direct appeal).

Because no avenue for review of this ineffective assistance of trial counsel claim remains

open to Walker in state court, the "absence of available State corrective process" renders this

claim exhausted. 28 U.S.C. § 2254(b)(1)(B)(i); *accord Aparicio*, 269 F.3d at 91. Of course, even

though the claim is "deemed" exhausted, it is still subject to a procedural default which can only

be cured by a showing of cause for the default and prejudice resulting therefrom, or a showing of

actual innocence. *Id.* (citing *Coleman*, 501 U.S. at 735, 748-49); *see also Gray v. Netherland*,

518 U.S. at 162 ("[T]he procedural bar that gives rise to exhaustion provides an independent and

adequate state-law ground for the conviction and sentence, and thus prevents federal habeas

corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice

for the default.") (citations omitted). The only "cause" Walker could offer for the procedural

default would be the ineffective assistance of his appellate counsel–that is, appellate counsel was

ineffective in failing to argue that trial counsel was deficient in failing to object to the trial

court's charge on justification. *See Aparicio*, 269 F.3d at 91.

The Court recommends finding that it is unnecessary to determine whether Walker has an

ineffective assistance of appellate counsel claim which could constitute "cause" for the purposes

of excusing the procedural default of the ineffective assistance of trial counsel claim sought to be

used as "cause" to excuse the procedural default of the stand-alone claim of error in the jury

charge on justification. This is because, on the record here, Walker cannot demonstrate that he

was "prejudiced" by trial counsel's failure to object to the jury charge on justification: On

Walker's direct appeal, the Appellate Division reached the merits of the claim, despite trial

counsel's failure to preserve the claim by a contemporaneous objection, and held that the trial

court's jury instruction on the justification defense "was proper[.]" *People v. Walker*, 275 A.D.2d

at 1009.  Even if Walker could argue that trial counsel's performed deficiently in failing to object

to the jury instruction, he nevertheless could not demonstrate how he was prejudiced by the

omission. *See Kanani v. Phillips*, No. 03 CIV. 2534PKCAJP, 2004 WL 2296128, at *27

(S.D.N.Y. Oct. 13, 2004) ("Furthermore, while the First Department found Kanani's vindictive

sentence claim to have been procedurally barred for failure to object, it also found that were it to

review the claim, it would have found that the trial judge properly exercised his discretion. Thus,

even if trial counsels performance in this regard was deficient, Kanani could not show prejudice,

thus failing the second *Strickland* prong."), Report & Recommendation adopted by No. 03

CIV.2534 PKC, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005) (citing *Waters v. McGuiness*, No.

99-CV-0615, 2003 WL 21508318 at *3 (E.D.N.Y. June 16, 2003) ("The Appellate Division

reached the merits of the claim on direct appeal and held that the verdict was legally sufficient to

establish guilt beyond a reasonable doubt and that it was not against the weight of the evidence.

Even if counsel was ineffective for failing to preserve the claim, therefore, petitioner was not

prejudiced because the Appellate Division entertained the claim and rejected it on the merits.").

*aff'd*, No. 03-2463, 99 Fed. Appx. 318, 2004 WL 1157732 (2d Cir. May 25, 2004); *Perez v.

Keane*, 95 Civ. 2640, 1996 WL 599695 at *10 n. 5 (S.D.N.Y. Oct. 17, 1996) ("Perez claims that

trial counsel was ineffective for having failed to preserve certain issues for appeal. However, the

Appellate Division may review unpreserved errors in the interest of justice, and indeed did so.

Thus, Perez was not prejudiced by the lack of objections.")). Walker's inability to demonstrate

prejudice as a result of trial counsel's allegedly deficient representation defeats a finding that trial

counsel was constitutionally ineffective under *Strickland v. Washington*. Walker therefore cannot use the ineffectiveness of trial counsel–premised on the failure to object to the jury instruction–as "cause" to excuse the procedural default of the jury instruction claim. *See Carpenter*, 529 U.S. at 451 ("[I]neffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.").

In order to excuse a procedural default, a petitioner must establish both cause *and* prejudice. *See Engle v. Isaac*, 456 U.S. at 134 n.43. Thus, a failure to make a showing of either means that the petitioner cannot overcome the procedural default. *See id.* In the interest of completeness, the Court further recommends finding that Walker cannot establish "prejudice" as a result of procedural default of the jury instruction claim, as discussed further below.

The Supreme Court held in *United States v. Frady* that the "degree of prejudice" a petitioner is "required . . . to show before obtaining unilateral relief for error in the jury charge" is "whether the ailing [jury] instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Frady*, 456 U.S. 152, 169 (1982) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*, 414 U.S. at 146, 147) (quotation marks omitted)). The Supreme Court reaffirmed in *Frady* that "'[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.'" *Frady*, 456 U.S. at 166 (quoting *Henderson v. Kibbe*, 431 U.S. at 154) (footnotes omitted)); *accord DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002) ("[T]he [Supreme] Court has held that a state prisoner making a claim of improper jury instructions faces a

substantial burden[.]"). As discussed below, Walker did not suffer "actual prejudice" as a result of the trial court's jury instruction on the defense of justification.

In Walker's case, the trial court ruled that the justification defense was applicable following four charges, which were submitted to the jury for deliberation: (1) attempted second degree murder (count one) and (2) the lesser included offense of second degree assault; (3) first degree assault (count two of the indictment) and (4) the lesser included offense of second degree assault. *See* T.412-26. The trial court explained to the jury the elements of each of these four counts without reference to the defense of justification. *See id.* Then, the trial judge explained the justification defense in a portion of the instructions clearly applicable to each of the four charges pending against petitioner:

> I now turn to the issue of self-defense which has been raised during the course of this trial. If the People have failed to establish all the essential elements of the crime of attempted murder in the second degree, the lesser included offense of assault second, first degree assault and assault second under the third count, as I have just instructed you, you must then find the Defendant not guilty.
> If that is your verdict, then you need not consider the further defense of self-defense. However, if you have determined that the People have established all of the elements of the crimes charged in this indictment, you must then turn to consider his defense, known in the law as justification, but which is commonly referred to as self-defense.

T.426-27 (emphasis supplied). The trial judge next admonished the jury as follows:

> Even if a Defendant is otherwise guilty, if you should determine that he acted in self-defense, that is[,] with justification, then he must nevertheless be found not guilty.
> Self-defense is a defense recognized in law. When a defendant raises such a defense and offers some evidence that he was acting in self-defense, it becomes the duty of the Court to submit such defense to the jury.
> The fact that I do so does not mean that I have any opinion whether or not this Defendant acted in self-defense. The provides that only the jury may determine whether the Defendant acted in self-defense. The Defendant does not have the burden of proving this defense. Instead it is the burden of the People to convince

-66-

you beyond a reasonable doubt that he was not acting in self-defense.

. . .

If the People fail to so convince you beyond a reasonable doubt [that petitioner did not act in self-defense], then you must find that the Defendant acted in self-defense and find him not guilty of the crime [sic] of attempted murder in the second degree, assault in the second degree, assault in the first degree and assault in the second degree.
Only if the [P]eople convince you beyond a reasonable doubt that the Defendant was not acting in self-defense, may you find him guilty of those crimes.

T.427-28, 434.

Appellate counsel's challenge to the instruction at Walker's trial was based on the following sentence, from the first part of the instruction quoted above: "However, if you have determined that the People have established *all of the elements of the crimes charged in this indictment*, you must then turn to consider his defense, known in the law as justification, but which is commonly referred to as self-defense." T.426-27 (emphasis supplied). Appellate counsel argued that the trial court's charge to the jury on the justification defense was erroneous because it effectively "informed the jury that it could not consider the justification defense unless it found appellant guilty of *all* the crimes charged[,]" thereby "preclud[ing] the jury from considering the justification defense as to the assault charges, if it found, as it did, that appellant was not guilty of attempting to cause the death of [the victim]." Pet'r App. Br. at 12, Resp't Ex. B. According to appellate counsel, the justification charge was defective because it failed to inform the jury that it "should consider the justification defense with respect to each particular count, *separately*, if it determined that appellant was guilty of that particular count[.]" *Id.* (emphasis supplied).

As a matter of New York law, "[a] court must instruct the jury on the defense of justification with respect to all of the counts submitted for its consideration," *People v. Bolling*,

24 A.D.3d 1195, 1196 (App. Div. 4th Dept. 2005), *aff'd*, 7 N.Y.3d 874 (N.Y. 2006), but the trial

court is not required to instruct the jury to consider the defense of justification in connection with

each count charged separately, *see id.* (citations omitted). In *People v. Bolling*, the trial court did

not submit the justification defense with each count "seriatim" but instead submitted the counts

together, and then gave an "appropriate charge on the defense of justification, instructing the jury

to acquit defendants of any charge it found he committed if the People failed to disprove

justification beyond a reasonable doubt." *Id.* at 1196-97.  The Appellate Division found that the

trial court's charge in *People v. Bolling* "was a correct statement of the law when viewed in its

entirety" and "adequately conveyed to the jury the correct principles of law to be applied to the

case[.]" *Id.* at 1197 (citations and quotations omitted). The defendant in *People v. Bolling* had

raised a slightly different argument than that raised in connection with Walker's appeal; Bolling

contended that the trial court was required to instruct the jury that an acquittal of a greater charge

based on the defense of justification precludes conviction of any lesser included offenses, even

where the jury is instructed to consider justification only after it has determined what, if any,

crime the defendant committed. *See id.* at 1196, 1197. The New York Court of Appeals affirmed

the Fourth Department's decision in *Bolling* but declined to consider whether the charge was

correct, finding instead that no justification charge was necessary under the facts of the case, and

if there was "any error in the charge . . . given [it] was harmless." *People v. Bolling*, 7 N.Y.3d at

875.  Walker therefore has not shown that the trial court's failure to instruct the jury seriatim, or

separately, on the defense of justification as to each charge submitted, was erroneous as a matter

of state law.

       Even if the trial court's instruction did constitute error under state law, that error, in and

of itself, would not be grounds for habeas relief. It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68  (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Before a federal court may overturn a conviction resulting from a state trial in which an erroneous instruction was used, or a properly requested instruction was not given, it must be established not merely that the instruction was erroneous, but that it "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v Naughten*, 414 U.S. at 146; *accord, e.g.*, *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). The Supreme Court has specifically rejected the notion that "an error in the instructions concerning an element of the crime charged amounts to prejudice *per se*, regardless of the particular circumstances of the individual case." *United States v. Frady*, 456 U.S. at 169 (reaffirming holding that a petitioner seeking relief on the basis of an erroneous jury charge "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions"). In weighing the prejudice to a defendant from an allegedly improper charge, the challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 147.

Here, the allegedly erroneous sentence came almost immediately after the judge's instruction that specifically listed all of the offenses to which the justification defense was applicable. *See* T.426-27. Therefore the jury, hearing the charge in its entirety, reasonably would have understood it to mean that the justification defense applied to the assault charges as well as

the attempted murder charge. Later in the charge, the trial court informed the jury that if the prosecution failed to convince it beyond a reasonable doubt that petitioner did not act in self-defense, it was required to find petitioner acted in self-defense and find him not guilty of "the crime [sic] of attempted murder in the second degree, assault in the second degree, assault in the first degree *and* assault in the second degree." T.434 (emphasis supplied). The charge as a whole, then, adequately conveyed to the jury the principle that Walker was entitled to have the jury consider whether he had acted in self-defense with regard to the attempted murder charge and the assault charges. The charge did not effectively preclude the jury from considering the justification defense as to the assault charges, if it found Walker not guilty of attempted murder. *Accord Duncan v. Fischer*, 410 F. Supp.2d 101, 114 (E.D.N.Y. 2006) ("After explaining the other elements of each of the crimes with which Duncan was charged, the trial court clearly explained to the jurors, in an instruction explicitly made applicable to each of those crimes, that they were required to find Duncan guilty not guilty of all charges against him unless they were convinced beyond a reasonable doubt that Duncan was not acting in self-defense."). Because the trial court instructed the jury that the prosecution's failure to prove that Walker was not acting in self-defense mandated an acquittal of all charges, any error in the particular language of the charge under New York law did not "by itself so infect[ ] the entire trial that the resulting conviction violates due process," *Cupp*, 414 U.S. at 147; accord *Duncan*, 410 F. Supp.2d at 114 (rejecting habeas claim based on trial court's failure to explicitly instruct jury that, if it found that defendant not guilty based on the justification defense with respect to the first count of the indictment, it must cease deliberating and not consider the second count or any lesser included counts) (citing *Morales v. Keane*, 1994 WL 38668, at *2 & *4 (holding that any error in the state

court's instruction concerning the "proper sequence of deliberation regarding the justification defense and the homicide counts" did not rise to the level of a constitutional due process violation)). The Court accordingly recommends that this challenge to the trial court's jury instruction on the justification defense be dismissed as without merit.

### 2.      Petitioner's Additional Claims of Error in the Jury Instructions

Walker attacks the trial court's jury instructions on three additional bases, which he argued in his *pro se* supplemental brief on direct appeal. The Appellate Division did not address these claims specifically on direct appeal but dismissed them along with "[t]he remaining contentions raised in defendant's *pro se* supplemental brief" which had "not been preserved for [its] review[.]" *People v. Walker*, 275 A.D.2d at 1009 (citing N.Y. Crim. Proc. Law 470.05(2)). Respondent has not asserted the defense of procedural default with regard to them and therefore has waived the defense. *See Gray v. Netherland*, 518 U.S. at 162.  Nor has respondent addressed these arguments on the merits. Nevertheless, as discussed below, the Court recommends dismissing them as without merit under any standard of review.

Walker first contends that "the judges [sic] findings are manifestly erroneous: He [sic] pursued Darin Grant out of the restaurant and stabbed him twice in the back; partially puncturing a lung or almost[.]"  Supp. Pet. at 5 (Dkt. #1). However, the trial court *did not* say this. This was a statement made by the prosecutor at the hearing held on October 6, 1997, at which the trial court issued its decision adjudicating Walker as a persistent felony offender and then sentenced him. *See* T.482. This claim must be dismissed as the factual basis for it is totally inaccurate.

Walker also complains about the portion of the trial judge's charge on justification in which she discussed the objective test to be applied by the jury in determining whether the

average person, finding himself in the same situation as the defendant, would have concluded that deadly physical force was necessary to defend himself. *See* T.433. In particular, Walker claims that the trial court "eliminated" his defense, *see* Pet'r Reply Mem. at 11 (Dkt. #9) (citation omitted), when it stated as follows: "*The People contend*, Ladies and Gentlemen, that there is some evidence that after Darin Grant was down and incapacitated, the Defendant continued to use deadly physical force against him. Even if you find that the Defendant was initially justified in using deadly physical force, the law permits him to do so only to the extent that he reasonably believes such force to be necessary to defend himself." T.433 (emphasis supplied).  The prosecution *did* contend that there was evidence that Walker continued to use deadly force against Grant when "when his back was turned and he is going to the door, he is leaving, he is not in a threatening position anymore." T.378. And, contrary to Walker's suggestion, the evidence presented by the medical and forensic witnesses overwhelmingly established that petitioner continued to use deadly force against the victim after the victim had begun to retreat and no longer reasonably could be said to pose a threat to Walker. Walker has not shown how this statement by the trial court was improper, let alone how it prejudiced him.

Finally, Walker contends that the trial court "gave an unbalance [sic] charge by instructing the jury that the defendant was the only interested witness in the case." Supp. Pet. at 6 (Dkt. #1). This, again, is a wholly inaccurate reading of the judge's actual charge, which was as follows:

> Although not required to do so, the Defendant in this case testified on his own behalf. His testimony should be considered by you as you would the testimony of any other witness. *A Defendant is, of course, an interested witness*, interested in the outcome of the trial.
> You may as jurors wish to keep such interest in mind in determining the weight

and credibility to be given his testimony. You should not, however, reject the
testimony of the Defendant merely because of his interest. It is your duty, as in the
case of all witnesses, to accept such testimony of the Defendant as you believe to
be truthful and reject only such testimony you believe to be false.

T.405.  Contrary to Walker's contention, the trial court never said that Walker was "the only"

interested witness. The trial judge instead properly noted that all defendants have an interest in

the outcome of their cases; her charge was fair and balanced, specifically instructing the jury that

a defendant's interest was not a proper basis for rejecting his testimony. Walker merely has

mischaracterized the court's language and has not shown that anything about the instruction was

incorrect or unfair. Accordingly, this claim should be summarily dismissed.

> **E.     Denial of the Sixth Amendment Right to the Effective Assistance of Trial
> Counsel.**

Walker's last claim for relief alleges numerous instances of alleged ineffectiveness on the

part of his trial counsel. In particular, he faults trial counsel for (1) failing to "conduct an

independant [sic] investigation into the facts and circumstances which lead [sic] to the incounter

[sic] concerning the defendant's key's [sic], which is the crucial issue in the case; (2) failing to

investigate alleged payment by Officer Maurice Grant, the victim's uncle, of "an out of court

settlement to have charges dropped against D. Grant and for the damage done to the restaurant"

by Grant and his friends; (3) failing to "request a *Huntley* hearing/any pre-trial [sic] to suppress

or challenge the police evidence"; (4) failing "to secure the attendance of the most crucial

witness with factual information and evidence supporting the defendants defense"; (5)

"abandon[ing] the defendant's defense of justification by failing "to allow the defendant the

opportunity to demonstrate how and where he obtained the knife from in the restaurant on the

defendants [sic] direct testimony and failing to establish that "the apartment keys was [sic] the

defendants [sic] personal property and improperly stating on summation that the "case is not about key's [sic], it's not about a car, it's about a stabbing"; (6) knowingly making "a false assertion to the court when he stated 'I have received full discovery from [the assistant district attorney]' but had not received "the 911 tape from the calls made by A. Jones, nor the 911 call allegedly made by D. Grant[;] . . . the original crime scene investigation report, photographs, etc. [sic]. . . [or] any statements made by Sharon Grant at any time"; (7) failing to "properly and effectively cross-examin [sic] the people's witness on the original report #058-705 demonstrating compelling facts and circumstances favorable to the accused; (8) failing to "make objection to the prosecutor's summation"; (9) failing to "make exception to the trial court's erroneous charge to the jury"; and (10) failing to investigate and call witnesses "who knew of D. Grants [sic] past history, hate and animosity toward the accused. Which was crucial to the defendants [sic] defense;" and that (11) "cumulative errors committed by trial counsel alone denied the defendant a fair trial and due process, overall the trial itself was a miscarriage and mockery of justice." *See* Supp. Pet. at 6-9 (Dkt. #1).

The Sixth Amendment's right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement review courts must be guided by its purpose, which is "to ensure a fair trial." Therefore, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim that his trial counsel was not functioning as counsel withing the meaning of the Sixth Amendment , a petitioner must

prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that he was prejudiced by counsel's deficient performance, *see id.* at 694. "Prejudice" means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" Id. at 694. *See also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The "performance" and "prejudice" prongs of the *Strickland* test may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

### 1.      Exhaustion of Petitioner's Ineffective Assistance Claims

Respondent asserts that none of foregoing arguments were raised by Walker on direct appeal or in support of his C.P.L. § 440.10 motion to vacate the judgment and therefore they are unexhausted. Respondent further asserts that these claims are unexhausted but procedurally defaulted because the state courts would refuse to entertain them on the basis of procedural bar rules should Walker attempt to exhaust them.

The Court agrees that Walker's appellate counsel did not assert a claim of ineffective assistance of trial counsel on direct appeal, and Walker did not challenge trial counsel's performance in his C.P.L. § 440.10 motion. However, in his *pro se* supplemental brief on direct appeal, Walker presented a laundry-list of alleged errors on the part of trial counsel. Because Walker is not represented by counsel, and in accordance with the Supreme Court's directive that

pleadings drafted by *pro se* litigants be held to less rigid standards than those drafted by attorneys, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), the Court finds that Walker sufficiently presented to the state courts on direct appeal the factual and legal bases for all of the ineffective assistance claims raised in his petition, *except* for the claims that trial counsel failed to "make objection to the prosecutor's summation" and "failed to make . . . exception to the judge's erroneous charge to the jury."

Although C.P.L. § 440.10 does not contain a time limit on filing motions to vacate the judgment and does not place a restriction on the number of such motions a defendant is permitted to file, it nevertheless contains a mandatory dismissal provision for claims that *could have been raised* on direct appeal because sufficient facts to elucidate the claims appeared on the trial record, but the defendant unjustifiably failed to raise them on appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c); *accord Sweet v. Bennett*, 353 F.3d at 139. New York courts have held that certain types of ineffective assistance claims are "not demonstrable on the main record" and thus are more appropriately raised in support of a collateral or post-conviction attack on the judgment, where the necessary record can be developed through an evidentiary hearing. *Id.* (citing *People v. Harris*, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678, 687 (2d Dept. 1985); *People v. Brown*, 45 N.Y.2d 852 (1978)). Here, however, the bases for these Walker's ineffectiveness claims–trial counsel's failure object to the prosecutor's summation and failure to object to trial court's jury charge on justification–were "particularly well-established in the trial record[,]" *Sweet v. Bennett*, 353 F.3d at 140 (holding that alleged error that was the basis for objection was well-established in the trial record where "[t]rial counsel plainly failed to object on inconsistency grounds to charging the counts in the conjunctive").

Walker has not offered a reason, and this Court sees none, suggesting that he would have needed a new evidentiary hearing to develop these claims. *Id.* The Court notes that Walker asserted other ineffective assistance of counsel claims on direct appeal in his *pro se* supplemental appellate brief, "so he cannot claim that he was consolidating all of his Sixth Amendment claims for one collateral attack with the benefit of a new evidentiary record for those other claims." *Id.* The Second Circuit consistently has ruled that where the trial record provided a sufficient basis for petitioner to argue his ineffective assistance of trial counsel claim on direct appeal, the claim "did not fall within those exceptions noted by the New York courts" held to necessitate collateral review on a C.P.L. § 440.10 application. *Id.* (citing *Reyes v. Keane*, 118 F.3d at 139 (holding that the trial record provided a sufficient basis for the ineffective assistance claim on trial counsel's failure to object to a jury charge); *Aparicio v. Artuz*, 269 F.3d at 91 (ruling that C.P.L. § 440.10(2)(c) barred a collateral attack based on trial counsel's failure to argue that indictment was multiplicitous and violated the constitutional prohibition against double jeopardy because petitioner unjustifiably failed to raise the ineffective assistance issue on direct appeal).

Thus, the Court recommends finding that Walker unjustifiably failed to assert that trial counsel was ineffective in not objecting to alleged prosecutorial misconduct on summation and to the jury charge on direct appeal despite a sufficient record. Consequently, he has waived the claims under C.P.L. § 440.10(2)(c). *Id.* The Court recommends that Walker's claims that trial counsel was ineffective in failing to "make objection to the prosecutor's summation or exception to the judge's erroneous charge to the jury" should be held to be procedurally defaulted for the purposes of federal habeas review. This finding of procedural default precludes federal habeas review of these claims unless Walker can show "cause" for the default and "prejudice"

attributable thereto, *Murray v. Carrier*, 477 U.S. at 485, or demonstrate that the failure to consider the federal claim on habeas will result in a  "fundamental miscarriage of justice," *id.* at 495 (citing *Engle v. Isaac*, 456 U.S. at 135). Here, Walker has not alleged cause or prejudice. Furthermore, Walker does not qualify for the fundamental miscarriage of justice exception because he has not come forward with new evidence that he is actually innocent of the charges on which he was convicted.

The Court notes that attorney error that arises to ineffective assistance within the meaning of the Sixth Amendment may constitute cause, but only if it amounts to an independent constitutional violation. *Edwards v. Carpenter*, 529 U.S. at 451-52. In order for a petitioner to use his trial attorney's ineffectiveness as "cause" to excuse a procedural default, he must have exhausted the ineffective assistance claim as an independent issue in state court. *Id.* The Court has considered whether the failure of Walker's appellate counsel to raise these issues of trial counsel's alleged ineffectiveness could serve as "cause" to excuse the procedural default of the ineffective assistance of trial counsel claims, and concludes that it cannot. First, Walker has never asserted that appellate counsel was ineffective on any basis, and therefore he lacks a fully exhausted an ineffective assistance of appellate counsel claim to use as "cause."

Moreover, Walker's appellate counsel was not ineffective in failing to argue that trial counsel was ineffective in failing to object to any alleged misconduct by the prosecutor. As discussed above, Walker's claims of alleged misconduct committed by the prosecutor in connection with the grand jury (*e.g.*, the alleged subornation of perjury) and at trial (*e.g.*, the introduction of "misleading" photographs and the failure to call "material witnesses") are all plainly without merit and therefore were not colorable issues for direct appeal. Furthermore,

Walker has never identified the allegedly improper remarks in the prosecutor's summation to which trial counsel should have objected or which appellate counsel should have challenged on direct appeal. Having failed to set forth any factual grounds for his claim that the prosecutor actually committed misconduct during summation, Walker provides no basis for finding that appellate counsel unreasonably chose to omit his claim that trial counsel "failed to make objection to the prosecutor's summation." Indeed, the Court has reviewed the trial transcript in its entirety and has found nothing that would warrant reversal of Walker's conviction on direct appeal or collateral attack.

Turning to the issue of trial counsel's failure to object to the erroneous jury instructions, the Court recommends finding that none of the jury instructions complained about were erroneous as a matter of state or federal law, as discussed above. Again, because Walker has failed to identify any errors in the trial court's jury instructions that would have warranted reversal on direct appeal or collateral review, he therefore cannot establish that trial counsel was ineffective in failing to object to them.

Because Walker's claims of ineffective assistance of trial counsel based on the failure to object to the prosecutor's summation and to the jury instructions are without merit, there is no basis for finding that appellate counsel was constitutionally deficient in failing to press those claims on direct appeal. *See Aparicio*, 269 F.3d at 99 ("The failure to include a meritless argument does not fall outside the "'wide range of professionally competent assistance" to which Petitioner was entitled.") (citing *Jameson v. Coughlin*, 22 F.3d 427, 429-30 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690)). Rather, appellate counsel was reasonable in choosing not to raise these plainly non-meritorious claims and instead asserting claims that had a greater

likelihood of success on appeal. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994) ("[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."); *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Furthermore, Walker cannot demonstrate that had appellate counsel included the omitted claims regarding trial counsel's ineffectiveness, there is a "reasonable probability" the state court would have granted his appeal. *Mayo*, 13 F.3d at 534 (citation omitted). Thus, he is unable to demonstrate that he was prejudiced by appellate counsel's failure to argue trial counsel's ineffectiveness. Accordingly, the Court recommends that the claims of ineffective assistance of trial counsel based on the "failure to make objection to the prosecutor's summation or exception to the trial court's erroneous instructions" be deemed exhausted and dismissed as procedurally barred from federal habeas review.

In the alternative, the Court recommends dismissing the ineffective assistance claim based on the failure to object to the "prosecutor's summation" as lacking a proper factual foundation, because Walker has not identified any instances of alleged misconduct or improper remarks by the prosecutor during summation. Walker's bare assertion that trial counsel "failed to make objection to the prosecutor's summation" is far too vague to state a colorable legal claim in state court or on habeas review.  It is not the reviewing court's responsibility to comb through the trial record to find errors for petitioner to raise. Because Walker has failed to set forth sufficient a factual basis to permit review of this claim, the Court recommends that it be dismissed.

Finally, the Court recommends dismissing the claim that trial counsel erred in failing to object to the trial court's jury instructions as without merit. As discussed above, Walker has not

demonstrated any errors of state law or federal constitutional law in any of the allegedly

objectionable instructions. He therefore has failed to identify a basis for finding that trial counsel

acted outside the range of reasonable professional practice in failing to object the trial court's

instructions to the jury. Nor has he shown how he was prejudiced by trial counsel's failure to

object to the instructions. As to the challenged instruction on justification, the Appellate Division

considered the underlying argument concerning the charge on the merits, despite the lack of

preservation. Although, due to trial counsel's failure to object, the Appellate Division did not

consider the merits of petitioner's remaining two claims regarding the allegedly erroneous

marshaling of evidence in the context of the justification charge and the interested witness

charge, Walker has still failed to demonstrate prejudice. This is because both claims are so

plainly without merit that there is no reasonable probability that the outcome of Walker's direct

appeal would have been different had the Appellate Division considered the substance of those

claims. Accordingly, the Court recommends that they be dismissed as without merit.

### 2. Merits of Petitioner's Remaining Ineffective Assistance of Counsel Claims

#### (a) Trial counsel committed errors relating to the issue of the ownership of the apartment keys and the car keys and allegedly "abandoned" of the justification defense.

According to Walker, trial counsel was ineffective in failing to "conduct an independent

investigation into the facts and circumstances which lead [sic] to the incounter [sic] concerning

the defendant's key's [sic], which is the crucial issue in the case." Supp. Pet. at 6-7 (Dkt. #1).

Walker also faults trial counsel for failing to establish that "the apartment keys was [sic] the

defendants [sic] personal property." Supp. Pet. at 7-8 (Dkt. #1). Respondent argues that whether

or not the car keys and apartment keys which Grant was trying to retrieve from Walker actually belonged to Walker had no bearing on the issues in the case because petitioner was not charged with any crime for possessing the keys. *See* Resp't Mem. at 22 (Dkt #6). Relatedly, Walker argues that trial counsel further undermined the justification defense by failing to allow Walker to testify on direct examination "how and where he obtained the knife[.]" Supp. Pet. at 8 (Dkt. #1).

Walker does not provide any argument in his petition or reply memorandum of law on the issue of the "keys," but he argued in his *pro se* supplemental appellate brief that the altercation began after Grant had started demanding that Walker give up his apartment keys, "because he [presumably Grant] was no longer allowed to live at" Sharon Grant's residence. Pet'r *Pro Se* Supp. App. Br. at 41, Resp't Ex. B. Walker refused to give up the keys because he, not Grant, "was living there under contract," and "Grant was there as a guest out of kindness on the part of [Walker]." Pet'r *Pro Se* Supp. App. Br. at 41, Resp't Ex. B. According to Walker, Grant's "motive for coming to the accused [sic] work place was 'solely' to evict [Walker] from his legal residence." *Id.* In Walker's opinion, that is "why the apartment keys are the crucial issue." Pet'r *Pro Se* Supp. App. Br. at 41, Resp't Ex. B.

It is true that based on the testimony at trial, the retrieval of keys provided the impetus for the confrontation between Walker and the victim: Grant testified that he had gone to the restaurant for the purpose of retrieving the keys to his mother's car and to her apartment. Giving Walker's *pro se* argument the strongest possible reading, it appears that he is contending that the rightful ownership of the keys that Grant was coming to retrieve was relevant to establishing that Grant was angry with Walker and was the aggressor. However, it is questionable that the

evidence was material, or that the jury was entitled to consider it in determining the issue of who

was the initial aggressor. Indeed, based on the trial court's instruction concerning the law on

appropriate factors to be used in determining who was the initial aggressor in cases where self-

defense is asserted, any evidence regarding the disputed ownership of the keys and Walker and

Grant's verbal confrontation over them could not be considered by the jury. The trial court

specifically instructed the jury as follows:

> In determining who was the initial aggressor, you may consider the following
> rules: One, verbal quarrels, the use of abusive language, the calling of names
> unaccompanied by physical acts. None of these justify the use of any physical
> force, deadly or otherwise. You may not consider these in determining who was
> the initial aggressor.

T.429. Even if the jury could have considered the evidence of the verbal altercation between

Walker and Grant over the key, there is no reasonable probability that the outcome of Walker's

trial would have been different had it been conclusively established that Walker, and not Grant,

had the rights to possess either the apartment keys or the car keys. Moreover, there was other

testimony that was more helpful to Walker in tending to establish that Grant initiated the

confrontation. Indeed, had there not been such testimony, Walker would not have been able to

secure a jury instruction on the defense of justification. Stated another way, if the trial court had

found as a matter of law that Walker was the aggressor, the jury would not have been entitled to

consider whether Walker was allowed to use deadly force during his encounter with Grant since

the altercation did not occur in Walker's dwelling. *See* N.Y. Penal Law 35.15(1)(a). Given the

overwhelming evidence that Walker continued to use deadly force against the victim after the

victim had started to retreat, the question of who owned the keys had no bearing on the jury's

determination as to whether Walker was not guilty of the charges against him. In this Court's

view, therefore, Walker was not prejudiced by trial counsel's failure to "investigate the keys."

Walker also claims that trial counsel "abandoned" the justification defense by incorrectly handling his direct examination concerning the issue of how he came to be holding the knife. Walker, however, does not explain in his habeas petition or his *pro se* appellate brief how he actually got the knife or how trial counsel should have questioned him on direct examination or what Walker's proposed testimony on direct examination would have been had trial counsel performed properly. Indeed, it became abundantly clear when Walker was confronted with his grand jury testimony on cross-examination that he was unwilling or unable to give a concrete answer as to how he obtained the knife.  In any event, on direct examination, defense counsel elicited from Walker that he swung the knife at whoever was coming after him, and that as he was swinging the knife, he was "thinking about staying alive." T.300, 309. Thus, defense counsel put before the jury Walker's version of events–that he was using the knife to defend himself against Grant and the other assailants, and that he was afraid for his life. The Court does not find that trial counsel's handling of Walker's direct examination was unreasonable under the circumstances here. Walker has failed to demonstrate that trial counsel performed deficiently in questioning him on direct examination. Moreover, because he has failed to demonstrate the reasonable probability of a favorable trial outcome had trial counsel performed differently, this aspect of his ineffective assistance claim should be dismissed.

Finally, Walker contends that trial counsel improperly stated on summation that the "case is not about key's [sic], it's not about a car, it's about a stabbing." Supp. Pet. at 8 (Dkt. #1). According to Walker, this is yet another example of how trial counsel's failure to emphasize the keys as the "main issue" in the case undermined his defense of justification. As discussed above,

the ownership of the keys was a matter of trivial importance. To his credit, counsel used this to

argue that the victim's stated reason for going to the restaurant–to retrieve his mother's keys–was

a pretext, and that the real reason he went there with a group of his friends was to "gang up" on

petitioner and attack him. Trial counsel stated, "You got to ask yourself this question, keys, keys,

all this over a set of keys that Darin Grant would have gotten any time." T.355. Trial counsel

then asked why Grant needed a group of friends in order to retrieve the keys, arguing to the jury

that Grant's real purpose in going to the restaurant was "to assault a man, trap[] him, corner[]

him." T.355. Counsel commented, "That's what this is all about. . . [I]n that small space in time

and . . . at least three [individuals] throwing bricks, throwing chairs." T.355. Thus, trial counsel

properly attempted to emphasize to the jury that Walker was being ganged-up upon and

overpowered by the victim and his friends and reasonably believed that he had no choice but to

use deadly physical force–that is what was necessary to succeed on a defense of justification.

Contrary to Walker's contention, the outcome of his trial was not about who owned "the keys,"

and trial counsel correctly chose not to focus on that issue.

### (b)       Trial counsel failed to investigate police misconduct.

Walker contends that "counsel failed to protect the defendant's rights to due process and

equal protection, where counsel was provided with information and evidence that police officer

Maurice Grant, the uncle of Darin Grant[,] offered and paid an out of court settlement" to the

owner of the restaurant where the incident occurred "to have charges dropped against D. Grant

and for the damage done to the restaurant by D. Grant and his (5) friends." Supp. Pet. at 7 (Dkt.

#1). Walker does not provide any further information on this point. After reviewing the record,

the Court surmises that the "information" to which Walker is referring is a July 15, 1996 report

prepared by the defense investigator, performed after his initial investigative efforts in June and July 1996. *See* Report of Roger Putnam dated 7/15/96, attached to Pet'r Motion to Expand Record (Dkt. #10). At that point, it appears that the investigator only had spoken to petitioner and his witnesses, Jones and Williams. According to the investigator, Williams told him that Officer Grant had phoned and "said that the family would take care of all damages and not to file charges against his nephew." *See id.*  On the basis of this statement by Williams, the investigator stated that he believed that Officer Grant was "successful in diverting" charges from being filed against Grant.

If true, this information is troubling but nevertheless unavailing.  Perhaps the inference to be drawn from such an effort on behalf of the victim, Grant, is that his uncle, a police officer, used special influence to avert any charges against Grant.  Grant's avoidance of charges, Walker seems to be arguing, deprived him of the opportunity to go to trial with a justification defense against a victim who himself was charged with a crime arising out of the incident.  Thus, as Walker's unarticulated argument seems to go, his justification defense would have been much more plausible had the victim been charged with a crime because it would have shown the victim's propensity for violence.  However, such an inference is so remote to be virtually useless to Walker in light of the overwhelming proof at trial that Walker continued to use deadly force against when Grant was running out the door, with his back to him.  Any inference to be drawn from the fact that Grant had been criminally charged in connection with the incident became irrelevant at that point: With the victim in full retreat and no longer posing a threat to Walker, no rational jury would have found that Walker's continued use of deadly physical force by stabbing Grant twice in the back was "reasonable" under the circumstances.

-86-

The investigator also noted that the manner in which the complaint against Walker was filed was different than usual and suggested that either "it was given special treatment *or* the complainant (*i.e.*, Grant) was in serious condition at the hospital necessitating a visit from Det. Lauber for the purpose of obtaining a sworn statement. I suspect the intervention of PO Grant and will attempt to learn more." *Id.* Stated another way, the only reasons that the investigator suggested as to why the police went to see the victim in order to obtain a complaint rather than making him go to the precinct to file a complaint were that (1) the victim's uncle, Officer Grant, somehow procured "special treatment" for him or (2) the victim's medical condition necessitated the visit from the police. *See id.* At that point, it appears that the investigator had only spoken to Walker and the defense witnesses; he clearly did not know about the victim's medical condition. Of course, the investigator's further inquiry would have revealed that the latter scenario is what actually occurred–Grant *was* in the hospital in serious medical condition as a result of the four stab wounds he received; he remained hospitalized for three days.

It is apparent that trial counsel and his investigator were duly diligent in exploring a possible claim of misconduct against the police but, as the investigation revealed, there was no basis for pursuing such a claim and the defense's efforts were better spent elsewhere. Because Walker has failed to show that trial counsel was ineffective in failing to investigate his allegations of "police misconduct," the Court recommends that this aspect of Walker's ineffective assistance claim be dismissed.

    **(c)**   **Trial counsel failed to move to suppress petitioner's statements to police.**

Walker faults trial counsel for failing to "request a *Huntley* hearing[7]/any pre-trial [sic] to suppress or challenge the police evidence[.]" Supp. Pet. at 7 (Dkt. # 1). As discussed above in this Report and Recommendation, Walker's oral statements to the police at the hospital were not made in violation of Walker's constitutional rights under *Miranda* and were properly admitted into evidence. Walker was not prejudiced by trial counsel's failure to make a pursue a pre-trial motion to suppress those statements which had little to no chance of success. A claim of ineffective assistance of counsel cannot be based on "the failure to make a meritless argument." *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) (denying ineffective assistance claim in part because motions not pursued by counsel lacked merit) (citing *United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir.), *cert. denied*, 506 U.S. 979  (1992)).  Accordingly, the Court recommends that this claim be dismissed.

> **(d)     Trial counsel failed to call Sharon Grant as a witness and obtain statements from her.**

Walker next claims that trial counsel erroneously "failed to secure the attendance of the most crucial witness with factual information and evidence supporting the defendants [sic] defense. This witness testimony could not and would not have supported the peoples [sic] case." Supp. Pet. at 7 (Dkt. #1). Walker's does not identify who this witness is in his Supplement to the Petition. *See* Dkt. #1. The Court surmises that this witness is Sharon Grant, based on Walker's brief on direct appeal wherein he argued that the prosecutor violated his Sixth Amendment Confrontation Clause rights by not calling Sharon Grant to testify. According to Walker, "Miss.Grant [sic], being the person allegedly responsible [sic] for Darin Grants [sic] motive, is

---

[7]     *People v. Huntley*, 15 N.Y.2d 72 (1965).

-88-

the key material witness[.]"

With regard to the failure to obtain statements by Sharon Grant, the victim's mother, Walker has not established that she actually made any statements regarding this incident. Apparently, though, trial counsel was considering calling her as a witness; Walker has attached to his motion to expand the record (Dkt. #10), a subpoena issued to Sharon Grant. She did not testify at trial, however. Again, the Court observes that Walker has failed to carry his burden of showing that trial counsel was unreasonable in failing to call Sharon Grant as a witness or that Walker was prejudiced by this failure. All he states is that Sharon Grant would have testified that the victim purportedly had "hate and animosity" toward Walker. Even if that were so, a generalized assertion that the victim disliked petitioner, in and of itself, does not tend to prove a defense of justification. Based on all of the record evidence, there is no reasonable probability that testimony by Sharon Grant as to Grant's dislike of Walker would have led to jury finding that Walker reasonably used deadly force to defend himself against Grant and therefore not guilty based on the defense of justification. Defense counsel developed his theory that Grant was the aggressor and that he and his friends overpowered Walker. This he established by eliciting testimony that Grant and his friends were physically much larger than Walker, and that they broke into the restaurant and started a melée which resulted in property damage to the restaurant. The circumstances surrounding how the confrontation started already supported a finding that Grant was angry at Walker for taking his mother's car and reporting it stolen, and that Grant was the initial aggressor, so Sharon Grant's testimony would have been cumulative.

In any event, there is no reasonable probability that this testimony of Grant's alleged dislike of Walker would have changed the outcome of the trial given the overwhelming medical

evidence concerning the severity of Grant's injuries and the near lack of any injuries to Walker; the forensic testimony that Grant's wounds were stab wounds and were not made someone just "swinging" a knife haphazardly in front of him; and the fact that Walker stabbed Grant *twice* in the back as Grant was retreating. Thus, Walker was not prejudiced by trial counsel's failure to secure Sharon Grant's testimony about the victim's alleged bias against Walker.

**(e)**     **Trial counsel knowingly made a false statement to the trial court.**

Walker contends that trial counsel "knowingly made a false statement to the court when he stated 'I have received full discovery from Mr. Mahoney [the prosecutor].' Counsel did not receive the 911 tape from the calls made by A. Jones, nor the 911 call allegedly made by D. Grant [sic]. Counsel did not receive the original crime scene investigation report, photographs, etc. [sic]. Nor did counsel receive any statements made by Sharon Grant at any time." Supp. Pet. at 8 (Dkt. #1). As discussed above, Walker raised a stand-alone *Brady* claim based on the prosecutor's failure to turn over to the defense this allegedly exculpatory material evidence. Thus, Walker's argument goes, trial counsel was lying to the trial court when he represented that he had received "full discovery" since the prosecutor had not disclosed this material. As discussed above, the tape recording of the 911 call made by Andrea Jones was erased pursuant to the routine policy of the police department. By the time of defense counsel's discovery demand and the prosecutor's request to the police department for a copy of the tape, it had been erased. Thus, it was not available to be turned over to the defense at the time of counsel's discovery request.

The Court cannot find any reference to an alleged 911 call by the victim, Darin Grant, in

the record of the criminal proceedings in state court or in the documents submitted in connection with Walker's petition. The Court notes Grant never testified that he called 911.  Walker has not established that Sharon Grant made any statements. Because Walker has failed to demonstrate that these items exist, they could not possibly been part of the discovery turned over by the prosecutor. Finally, with respect to the "original crime scene investigation report, photographs, ect. [sic]," Supp. Pet. at 8 (Dkt. #1), Walker does not specify what these items are, and his failure to state a sufficient factual basis to allow review of this claim is reason enough to warrant its dismissal. Walker may be referring to the "original evidence" purportedly gathered in connection with the investigation of the burglary complaint against the victim, which petitioner contended was withheld by the prosecutor in connection with his stand-alone *Brady* claim, *see* Supp. Pet. at 5 (Dkt. #1). Even so, Walker has failed to demonstrate that this alleged "evidence" exists.

Assuming for the sake of argument that this "original evidence" from the burglary investigation existed, petitioner failed to establish that it would constitute material, exculpatory *Brady* information, as discussed above. Therefore, trial counsel's failure to insist on the production of the alleged "original evidence" could not have constituted ineffective assistance. *See United States v. Kirsh*, 54 F.3d at 1071 (denying ineffective assistance claim in part because motions not pursued by counsel lacked merit).  Furthermore, as discussed above, petitioner has not established that–even if trial counsel had obtained the information at issue–there is a reasonable possibility that he would not have been convicted. That defeats a finding that Walker was prejudiced by trial counsel's representation in this regard.

Walker has failed to demonstrate that trial counsel made any "false statement" to the court about the extent of discovery received from the prosecutor. Nor has he established that he

was prejudiced by trial counsel's performance in handling the discovery received from the prosecution. This claim of ineffective assistance of trial counsel is without merit and should be dismissed.

>    **(f)    Trial counsel failed to effectively cross-examine a prosecution witness.**

Walker asserts that trial counsel "failed to properly and effectively cross-examin [sic] the people's witness on the original report #058-705 demostrating [sic] compelling facts and circumstances favorable to the accused." Supp. Pet. at 9 (Dkt. #1). As an initial matter, the Court notes that "report #058-705" was one of the items of alleged *Brady* material that Walker claims that the prosecutor improperly withheld. The Court questions, then, how trial counsel could have been expected to "effectively cross-examine" a witness about a report to which counsel did not have access.

In any event, the Court assumes that the "people's witness" to whom Walker is referring to Officer Howard, who testified on cross-examination about a general offense report (#058-695) which had essentially the same content as report #058-705. *See* General Offense Report #058-695 and General Offense Report #058-705, attached to Petitioner's Motion to Expand the Record (Dkt. #10). In fact, the report about which trial counsel cross-examined Officer Howard contained more detail about how the victim and his friends "did force their way into [the] restaurant rear screen door, causing damage to [it]" and "did hit [Walker] in head with a brick . . . [and] also assaulted [Walker] about the head & body (injury to left thumb sustained, laceration)." This report was introduced into evidence at trial, and counsel elicited from Officer Howard that his investigation led him to believe that the victim and his friends had committed a burglary by

breaking into the restaurant and had assaulted petitioner. It appears from the trial record that counsel brought out from Officer Howard the pertinent facts regarding his investigative report concerning the burglary and assault by the victim. Trial counsel also elicited from Officer Howard testimony that the kitchen was "messed up" with items "tossed around" and that the back door was "partially damaged." T.148-49.

Notably, Walker has failed to indicate how trial counsel should have cross-examined Officer Howard differently, let alone how counsel's cross-examination of Officer Howard was outside the range of reasonable and competent assistance. Decisions concerning the nature and extent of cross-examination are the type of strategic decisions which, if reasonably made, will not constitute ineffective assistance of counsel. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 958 (1987). Even cross-examination by trial counsel that elicits testimony damaging to the defendant does not necessarily amount to constitutionally ineffective assistance. *See United States v. Salameh*, 54 F. Supp.2d 236, 254 (S.D.N.Y. 1999) (rejecting claim of ineffective assistance of trial counsel where "there was overwhelming evidence of [defendant's] guilt"; counsel's "chosen lines of cross-examination were bound to occasionally fail to elicit the testimony expected" and did "not mean that such failures were errors outside the range of reasonable and competent assistance or that they affected the reliability of the verdict against [defendant]"), *aff'd*, 16 Fed. Appx. 73, Nos. 99-1619L, 99-1623 CON, 99-1620 CON, 99-1621 CON (2d Cir. Aug. 6, 2001). During his cross-examination of Officer Howard, trial counsel pursued the defense strategy of attempting to show that the victim and his friends were the initial aggressors–that they broke into the restaurant and caused a great deal of damage, and then overpowered petitioner and assaulted him. Trial counsel's cross-examination elicited

testimony that was helpful to, rather than detrimental to the defense theory. Walker has

completely failed to demonstrate how counsel's cross-examination of the witness was

incompetent, much less unreasonable under prevailing professional norms. Moreover, Walker

has not demonstrated how he was prejudiced in any way. This claim should be dismissed.

> **(g)** **Trial counsel's cumulative errors deprived petitioner of a fair trial.**

Finally, Walker has asserted that trial counsel's "cumulative errors" denied him a fair trial

and that "overall, the trial itself was a miscarriage and mockery of justice." The Court has

reviewed the trial transcript in its entirety and finds that Walker received capable representation

from his attorney. Defense counsel competently cross-examined the prosecution's witnesses and,

through cross-examination of prosecution witnesses and the witnesses he called, presented a

cogent defense of justification. He was able to secure jury instructions on the defense of

justification as to three out of four counts of the indictment. Moreover, the jury acquitted Walker

of the most serious charge in the indictment, attempted murder in the second degree. In this

Court's opinion, the jury ultimately rejected Walker's theory of self-defense not because of any

the alleged errors by trial counsel but because the prosecution presented overwhelming evidence

that Walker continued to use deadly force against the victim, Grant, even after Grant was

retreating. Thus, Walker cannot demonstrate how he was prejudiced by trial counsel's

performance. There is no reasonable probability that, but for his attorney's allegedly deficient

acts or omissions, the outcome of his trial would have been different. The Court accordingly

recommends that Walker's claim that the cumulative errors of trial counsel denied him his right

to the effective assistance of counsel and a fair trial be dismissed.

## V.     Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by Willie Walker (Dkt. #1) be **DENIED**. Because the Court finds that Walker has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), the Court recommends that a Certificate of Appealability be **DENIED** as to all of Walker's claims.

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 25, 2007
            Rochester, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: Rochester, New York
         June <u>25</u>, 2007.